[No. B160939. Second Dist., Div. Five. Jan. 10, 2008.]

BARBARA A. LEVIN, Plaintiff and Appellant, v.
UNITED AIR LINES, INC., et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of Procedural Background and Disscussion, parts D through G.

**COUNSEL**

Barbara A. Levin, in pro. per., for Plaintiff and Appellant.

Worthe Hanson & Worthe, Jeffrey A. Worthe and John R. Hanson for Defendants and Respondents United Air Lines, Inc., and Mary Lynn Anderson.

Mendes & Mount, Alan H. Collier and Mark R. Irvine for Defendants and Respondents Argenbright Security, Inc., Gladys Block, Olympia Villafuerte Lynch and William Aquino.

Vanderford & Ruiz, Rodolfo F. Ruiz, Heather J. Hamby and Kristen J. Nesbit for Defendant and Respondent City of Los Angeles.

**OPINION**

**MOSK, J.—**

## INTRODUCTION

Plaintiff and appellant Barbara A. Levin (plaintiff) arrived at the United Air Lines, Inc. (United),[1] terminal at the Los Angeles International Airport (LAX)

---

[1] After the matter was fully briefed, United filed a motion to dismiss on the grounds that plaintiff's claims against it had been discharged in bankruptcy. We grant United's motion and dismiss the appeal as it relates to plaintiff's claims against United.

20 minutes before the scheduled departure of her flight to Vancouver. A series of contentious exchanges ensued between plaintiff, on the one hand, and personnel from United, Argenbright Security, Inc. (Argenbright), and the Los Angeles Airport Police, on the other, during which exchanges plaintiff admittedly made at least three separate references to a "bomb" in her luggage. The incident culminated in plaintiff's arrest for making a false bomb report, although she was never formally charged with a crime.

Plaintiff sued United, Argenbright, the City of Los Angeles, and several individuals alleging nine causes of action arising from the incident and her arrest. The jury returned a verdict in favor of each defendant and against plaintiff on all of her claims.

On appeal, plaintiff challenges, inter alia, the trial court's modified jury instruction on probable cause to arrest, contending that the erroneous modification prejudicially affected the outcome of the verdicts on her claims based on false arrest. In the published portion of this opinion, we hold that a false statement to airport personnel or peace officers about a bomb in luggage, even if not seriously made or understood, can be the basis for a violation of Penal Code section 148.1, subdivision (a) (section 148.1, subdivision (a)). Therefore, the trial court did not err when it modified the probable cause jury instruction because the modified instruction accurately stated the applicable law governing probable cause to arrest and the crime of making a false bomb report. Any claimed deficiency in other aspects of the instruction did not prejudicially affect the verdicts.

## FACTUAL BACKGROUND

### A. *Plaintiff's Description of the Incident*[2]

As part of a planned scuba diving trip, plaintiff purchased a ticket on United from LAX to Vancouver, British Columbia. From Vancouver, she would take a connecting flight on a Canadian airline to Port Hardy, from where the dive boat would leave. Her United flight was scheduled to depart on Saturday, August 21, 1999, at 12:40 p.m.

The morning of her United flight to Vancouver, plaintiff left home between 10:00 a.m. and 10:30 a.m. and arrived at "Lot B"[3] an hour and a half before

---

[2] The following facts are taken from plaintiff's trial testimony, during which she described the incident leading to her arrest. Defendants' descriptions of the incident, which vary in several particulars from plaintiff's description and, at times, from one another, are set forth in the subsequent section.

[3] Lot B is a remote parking lot in which plaintiff regularly parked and from which she would take a shuttle to LAX.

her 12:40 p.m. scheduled departure time. Because Lot B was crowded, it took about a half-hour to find a parking space. Plaintiff parked a long distance from where the shuttle to LAX left, and it took five to 10 minutes to walk to the shuttle. She carried her purse, "a metallic kind of grey-looking briefcase-sized bag containing about $5000 worth of underwater camera equipment that [she] had rented," and a "big dive bag which look[ed] like . . . a lumpy duffel and . . . ha[d] various compartments for various types of dive gear." She waited 10 minutes for the shuttle, and it took another 10 minutes for the shuttle to travel to the United terminal at LAX.

Plaintiff exited the shuttle at "Terminal 8," but soon discovered that her United flight would be departing from "Terminal 7." She walked as fast as she could to Terminal 7, where she saw a long line at the ticket counter. Realizing that she would miss her flight if she waited in line, plaintiff approached a United representative and inquired, "Excuse me. I have 20 minutes to catch my flight. Can you help me?" The United representative looked at the line "snaking out towards the door" and informed plaintiff, "Yep, you're going to miss it." Plaintiff asked if there was anything the representative could do, to which the representative replied, "Everybody is late." Plaintiff then asked if she could check her bag at the gate and the representative said, "Yes."

Plaintiff proceeded to the security screening area in Terminal 7 (screening area), and put her purse and camera case through the "x-ray machine." But when she lifted her dive bag to put it through, she saw a "plastic template" at the front of the machine that she had never seen before. Because her dive bag would not fit through the template, plaintiff "lifted the bag off, and as [she] did so, Argenbright [employee] . . . Ralph Lopez came over to [her] and said, 'You have to check it back at the ticket counter,' " and pointed back to the counter. Plaintiff looked at her watch; it was approximately 12:20 p.m.

Plaintiff approached a United representative stationed outside the screening area who helped her obtain a luggage cart, and plaintiff then proceeded back to the ticket counter. Plaintiff "went right up to the ticket counter, ignored the line, . . . and kind of barged in." She informed the ticket agent that she had only 15 minutes to make her flight and presented her ticket. The agent responded, "No. You only have ten minutes before your flight, and it's too late. The bag won't make it through the conveyor." Plaintiff asked about the next flight to Vancouver and learned that it arrived in Vancouver too late for her to make the connecting flight to Port Hardy. Plaintiff then asked if she could take her bags to the gate and check them there, and the agent said, "Yes."

Plaintiff returned to the same screening area and walked through the metal detector with all three of her bags. As Ralph Lopez (Lopez) approached her,

she dropped all three bags and said, "Please do a manual search." Lopez replied, "It's not our protocol," and started walking back to his post. As he walked away, he pointed to the ticket counter, to which plaintiff replied, "I don't have time." Lopez then stated, "You can take it if you want to." Plaintiff moved her bags farther into the "sterile" portion of the screening area, beyond the exit to the metal detector, opened her dive bag, and said to Lopez, "Look, no bomb. No gun. No knife. I'm going to the gate." When Lopez did not respond, plaintiff inexplicably left the dive bag and her purse, and proceeded to the gate with the camera case.

The plane was still at the gate when plaintiff arrived, but the door to the gateway to the plane was closed. Plaintiff handed her ticket to a person at the gate who said, "The plane is full." Plaintiff replied, "You mean you bumped me? Because I have assigned seats already on my ticket." The person responded, "No. You never checked in."

Plaintiff concluded that she had missed her vacation and was angry. She decided to return to the screening area, pick up her bags, and go home. As she was walking toward the screening area, she was approached by Lopez and his supervisor William Aquino (Aquino). Lopez said, "We have been looking for you," and plaintiff countered, "Now you can take all week to check [my bags] because I'm not going anywhere." Plaintiff was upset, but was not yelling.

Plaintiff walked back to the screening area with Lopez and Aquino. At the screening area, Lopez admonished, "You shouldn't have gone to the gate." Plaintiff replied, "I did everything I could do to get you to check my bags. I even opened one of them for you." Lopez responded, "That could have been a diversionary tactic." Hearing that, plaintiff threw up her hands, rolled her eyes, and said, "Yeah, right. It's a bomb."[4] No one responded.

Plaintiff exited the screening area and went to the back of the security line in an effort to reenter the screening area and retrieve her purse and dive bag. Before she reached the screening device, three airport police officers took her out of line and said, "Come with us." Plaintiff later determined that the three officers were Ronald Code (Officer Code), Malvarene Hayes (Officer Hayes), and Officer Castro. The officers took plaintiff, who was still holding her camera bag, "[away] from the security area out of earshot of all the passengers and beyond a half a football [field] length [to] somewhere else."

None of the officers asked plaintiff what her bag contained. Plaintiff did not engage in any conversation with the officers as they walked her to the new

---

[4] The parties submitted expert psychiatric testimony explaining that plaintiff becomes sarcastic under stress.

location. After standing at the location for a few minutes, plaintiff overheard Officer Hayes say to Officer Castro, "criminal trespass" and "criminal conspiracy." Officer Hayes explained to plaintiff that the latter comment referred to the unit that handled these types of situations.

Plaintiff saw Officer Code return to the screening area and speak with Argenbright personnel. No one, however, was speaking to plaintiff.

As plaintiff stood with the other two officers, United supervisor Mary-Lynn Anderson (Anderson) approached them. Officer Code returned from the screening area and spoke to Anderson. Plaintiff heard Anderson state her name to Officer Code, identify herself as a United supervisor, and inform him that she was "just passing through." When plaintiff heard Anderson was a United supervisor, she waved her hand and said, "If your agent had helped me, I would have made my plane." Anderson replied, "Don't you wag your finger at me. I don't like your attitude." Plaintiff, "taken aback" by Anderson's attitude, responded angrily, "Well, if you're going to jerk me around, why shouldn't I jerk you around?" Anderson advised plaintiff that plaintiff was not taking responsibility for her behavior, and had broken the "two hour rule." Anderson further stated that she would not let plaintiff fly on United because she did not "know what [plaintiff would] do." Anderson informed plaintiff that United could have arranged another flight for her, but that she was not going to help plaintiff—other than to refund her ticket— because she did not like plaintiff's behavior.

Plaintiff found Anderson's comments provocative and inappropriate for a United representative dealing with an angry customer. She told Anderson that Anderson did not even know what happened to make plaintiff so angry. Anderson replied, "That's right. I don't know. And I don't care. I don't like your behavior now and I don't want you flying [on] my planes." Plaintiff retorted, "Fine. I'll sue."[5]

Plaintiff then asked Anderson, "Look, if you have a problem with my behavior why don't we sit down and discuss it." Anderson advised plaintiff that she had "already decided [she did not] want [plaintiff] flying United again" and demanded an apology. Plaintiff thought for a minute and then offered, "I'm sorry." At that point, Anderson turned to plaintiff's unopened bag and asked, "What's this, there's a bomb?" Imitating Anderson's tone, words, and gesture, plaintiff answered, "Yeah, there's a bomb."

Officer Hayes became angry and stated, "Turn around so I can cuff you." Plaintiff exclaimed, "What?" in outrage. When Officer Hayes repeated her

---

[5] Plaintiff was a former prosecutor in Illinois and was licensed to practice law in California at the time of the incident.

order, plaintiff queried, "For what?" Officer Hayes answered, "For making a false bomb report." Plaintiff asked, "If you want to know what's in the bag, why don't you look in the bag?" Officer Hayes replied, "That's not the point."

Plaintiff raised her left hand in a "stop gesture," and said, "If you want me to go with you, I will. But no cuffs." Officer Hayes did not say anything, but when plaintiff raised her arm, Officer Hayes grabbed it and started twisting it around. Plaintiff reached down and grabbed her shorts. She had "two police officers on each arm yanking—trying to yank each hand off." The officers were "yanking" plaintiff's arms trying to make her loosen her grip on her shorts, but plaintiff could not "get [herself] to do it." Eventually plaintiff was handcuffed and led away.

Plaintiff was taken to the airport police station and placed in a detention cell. After an hour or two, Officers Hayes and Code transported plaintiff to the "Van Nuys women's prison" where she was strip-searched. She remained in jail from late afternoon until 11:00 p.m.

### B. *Defendants' Descriptions of the Incident*

#### 1. *Aquino*

The day of the incident, Aquino was working for Argenbright in charge of security screening at the Terminal 7 "checkpoint." Lopez told Aquino that an individual had come through the metal detector with an unscreened bag. Aquino approached plaintiff and advised her she had to leave the screening area and put her bags through the X-ray machine. Plaintiff informed Aquino that she was running late and did not have time to check in her bags. Aquino advised plaintiff to speak with a United representative, and plaintiff explained that her bag was too large to pass through the template in front of the X-ray machine. Plaintiff unzipped her bag and asked Aquino to inspect it for her, but he did not recall the exact words she used. If she had used the word "bomb" at that point, he would have taken some action.

When plaintiff left the screening area and went up the escalator with her bag, Aquino informed his supervisor, Gladys Block (Block). Aquino picked up plaintiff's dive bag, dragged it outside the screening area to the lobby, and left it with a United representative. When he came back to the podium inside the screening area, another Argenbright supervisor, Olympia Villafuerte Lynch (Lynch), told him to meet Block upstairs. As Aquino ascended the escalator, he saw plaintiff coming toward him from the gate area.

Aquino escorted plaintiff back in the direction of the "exit lane" from the screening area. As they were going down the stairs, Aquino advised plaintiff

that she had violated federal regulations by going through security without being screened, and that she must exit the screening area. At the exit lane, Aquino met Lynch. While there, Aquino heard plaintiff make reference to a bomb. From the context in which plaintiff used the word, Aquino understood plaintiff to be saying "that she had a bomb in her bag, or something to that effect." Aquino interpreted her statement as a "threat." Aquino understood from Lynch's "body language" that Lynch had also heard plaintiff's statement about a bomb.

At some point after plaintiff made the statement about a bomb, Aquino saw Officers Hayes and Castro arrive at the scene. Because Lynch and the officers were now involved, Aquino resumed his duties as the supervisor of the checkpoint. Aquino, however, heard plaintiff repeat that there was a bomb in her bag in the presence of the officers.

### 2. Lynch

The day of the incident, Lynch, an Argenbright supervisor, returned from lunch to the screening area in Terminal 7. Aquino approached her and informed her that a woman had breached security and that Block was following her. Lynch told Aquino to join Block. Lynch saw plaintiff return to the screening area escorted by Aquino and Block. Lynch told plaintiff to exit the screening area. Plaintiff went through the exit lane carrying a silver briefcase. But then she turned around and attempted to come back through the exit lane. Lynch intercepted her and told her "No, you have to go through security." Plaintiff then placed the briefcase on the floor and stated that she had a bomb.

After she heard plaintiff make the statement about a bomb, Lynch immediately summoned Officer Code who was not far from her location. He arrived quickly, and Lynch probably told him what plaintiff had said. Sometime after Officer Code arrived, Lynch heard plaintiff repeat the bomb statement in his presence. After that, Lynch went back to her regular duties. Based on experience, Lynch assumed that plaintiff would be taken to jail.[6]

### 3. Block

The day of the incident, Block was employed by Argenbright as a duty manager, the highest ranking supervisor at the security screening checkpoint

---

[6] As a security screener, Lynch was trained that when a passenger uses the word "bomb" at a screening station, the statement was to be taken "seriously." When such a statement was made in her presence, Lynch was trained to call the police. She was not required to first determine whether the person making the comment was joking or being sarcastic. She did not receive any training on how to determine a person's intention in making such a comment.

for Terminal 7. On that date, Lynch, Aquino, and Lopez were working under Block's supervision. Block was in her office when she heard raised voices out at the checkpoint. She left her office to determine what was happening. One of several Argenbright employees at the checkpoint told her a passenger had come through the checkpoint without being cleared. The employees pointed toward the escalator to a woman in shorts. Block saw plaintiff going to the escalator and followed her. Block never lost sight of plaintiff.

Block observed plaintiff standing near a wall at the top of the escalator. Block waited at the top of the escalator for Aquino to arrive and then they both approached plaintiff. Block and Aquino walked with plaintiff down the stairs towards the security checkpoint. At the bottom of the stairs, Block separated from Aquino, and that was the last time she saw plaintiff that day. Block did not hear plaintiff make any statement about a bomb. Sometime later, however, Lynch informed Block that plaintiff was going to jail for making a bomb threat.

### 4. *Anderson*

The day of the incident, Anderson, a United supervisor, was walking from the administrative office through the lobby when she saw airport police officers with someone she assumed was a United customer. She just happened to be walking by. Her job responsibility at that time was to "watch and observe." Anytime she would see a police officer talking to a customer, Anderson would stop to determine what was happening.

She stood 10 to 15 feet from the officers and plaintiff, and learned that plaintiff did not make a flight and that there was a "security issue." She also heard one of the officers ask plaintiff, "Did you really say you had a bomb?" And plaintiff answered, "Yes. I said I have a bomb."

At some point, plaintiff became aware of Anderson's presence, waved her finger at Anderson, and asked Anderson if she was a United representative. When Anderson responded affirmatively, plaintiff said, "I need you to step over here, and I need to talk to you." But one of the officers intervened stating, "No, no. You don't need to talk to Ms. Anderson."

One of Anderson's responsibilities was to observe passengers and make a determination as to whether they were fit to fly on United. When she observed plaintiff on the date of the incident, she determined that plaintiff was a safety risk. Plaintiff was "screaming, she was yelling, [and] she was not cooperating with the police." Anderson, "just didn't feel comfortable that [plaintiff] was going to calm down." And plaintiff never calmed down in Anderson's presence. Based on Anderson's training and experience, she

concluded that plaintiff was "out of control." As a result, Anderson informed plaintiff that she would not be flying on United that day. Anderson remained at the scene until plaintiff was handcuffed and escorted away.

### 5. *Officer Code*

The day of the incident, Officer Code, an airport police officer, was the "security officer" in Terminal 7. He had just returned from lunch and sat down behind the podium in the screening area[7] to review some paperwork when Lynch called to him. He looked in her direction and walked over to her. Lynch pointed to a woman standing 15 feet from her and said, "That lady said she had a bomb." Officer Code immediately walked over to plaintiff, pointed to her bag, and said something to the effect of, "What did you tell them about your bag?" Plaintiff replied, "That I have a bomb." Plaintiff was "flustered, and louder than normal. She was upset." Officer Code considered plaintiff's statement a "bomb threat." After Officer Hayes arrived at Officer Code's location and took over the questioning of plaintiff, Officer Code spoke with both Lynch and Aquino about plaintiff's statement.

Officer Code was present when Officer Hayes arrested plaintiff.[8] He assisted Officers Hayes and Castro in handcuffing plaintiff.[9]

### 6. *Officer Hayes*

The day of the incident, airport police Officer Hayes was assigned to patrol the United terminals at LAX. She was relieving Officer Castro at the Terminal 8 screening station when she was approached by Block. Block informed Officer Hayes that someone had bypassed screening and that some of Argenbright's agents had been assigned to follow that person. Officer Hayes walked with Block from Terminal 8 toward Terminal 7. They observed an Argenbright agent and plaintiff returning to the Terminal 7 screening area. The agent and plaintiff went down the stairway to the screening area before

---

[7] The airport police officer assigned to the Terminal 7 checkpoint sits behind a podium located inside the screening area.

[8] Plaintiff has failed to provide us with the entirety of the record. For example, there is evidence the decision to arrest was made by Sergeant Glenn Durham. Sergeant Durham testified, via a videotaped deposition, that he informed plaintiff that it was illegal to make a false bomb report and if she did it again she would be arrested. When she repeated the false report, she was thereupon arrested. The full videotaped testimony of Sergeant Durham, exhibit 17, has not been provided, notwithstanding plaintiff's responsibility to provide an adequate record on appeal. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295–1296 [240 Cal.Rptr. 872, 743 P.2d 932].) We nevertheless address the appeal on the merits.

[9] There was testimony from a security consultant, Clifford Dow, which was critical of the investigative methods and the arrest. Mr. Dow was permitted to testify that plaintiff was unlawfully arrested because she did not violate section 148.1, subdivision (a).

Officer Hayes and Block did. On her way down the stairs, Officer Hayes encountered Lynch who told Officer Hayes that plaintiff had made a statement about a bomb.

Officer Hayes saw plaintiff standing outside the screening area talking with Officer Code. Officer Hayes spoke with Lynch briefly and then approached Officer Code, stood by him, and observed what transpired. Officer Code was trying to clarify with plaintiff what had happened and convey to her the seriousness of the situation. Plaintiff was agitated and becoming noisy.

Officer Hayes heard plaintiff say words to the effect of, "I have a bomb in my bag." Plaintiff repeated the statement three or four times. Officer Hayes did not believe plaintiff had a bomb, but she arrested plaintiff for making a false report of a bomb. When Officer Hayes attempted to handcuff plaintiff, she resisted, and Officers Code and Castro had to assist in handcuffing plaintiff. It appeared to Officer Hayes that plaintiff was resisting arrest.

Officer Hayes transported plaintiff to the police station at LAX, where plaintiff was placed in a holding cell. Plaintiff was eventually booked at the Van Nuys jail and strip searched.

### C. *Claims, Verdict and Appeal*

Plaintiff asserted claims for, inter alia, false imprisonment and arrest. The jury returned a verdict in favor of defendants. Plaintiff challenges on appeal a modified jury instruction and various orders of the trial court.

## PROCEDURAL BACKGROUND[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISCUSSION

### A. *The Modified Instruction*

Plaintiff contends that the trial court's modified probable cause instruction—as it related to the facts necessary for a violation of section 148.1, subdivision (a)[15]—misstated the law and, in effect, directed a verdict in

---

[*]See footnote, *ante*, page 1002.

[15] Section 148.1, subdivision (a) provides: "Any person who reports to any peace officer listed in Section 830.1 or 830.2, or subdivision (a) of Section 830.33, employee of a fire department or fire service, district attorney, newspaper, radio station, television station, deputy district attorney, employees of the Department of Justice, employees of an airline, employees of an airport, employees of a railroad or busline, an employee of a telephone company,

defendants' favor. "[I]nstructional error requires reversal only ' "where it seems probable" that the error "prejudicially affected the verdict." ' ([*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548,] 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].) The reviewing court should consider not only the nature of the error, 'including its natural and probable effect on a party's ability to place his full case before the jury,' but the likelihood of actual prejudice as reflected in the individual trial record, taking into account '(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.' (*Id.* at pp. 580–581.)" (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983 [67 Cal.Rptr.2d 16, 941 P.2d 1203].)

In connection with plaintiff's seventh cause of action for false imprisonment and arrest,[16] the parties stipulated that the following version of the BAJI No. 7.66 jury instruction should be read to the jury: "If you find that the police officer defendants have reasonable cause to believe that plaintiff made a false report of a bomb, you must find that there was reasonable cause to arrest the plaintiff. If you find that such facts are not true, you must find that there was not reasonable cause to arrest the plaintiff." Because plaintiff was arrested for a violation of section 148.1, subdivision (a), the trial court also read pertinent parts of that statute to the jury.[17]

During deliberations, the jury submitted the following written question to the trial court: "We need further clarification on California Penal Code section 148.1(A) [*sic*] as to intent for Penal Code section 148.1(A) [*sic*]. [¶] If arresting officer had no reasonable belief that the plaintiff was making a false bomb threat by her statement, then has a felony been committed under Penal Code section 148.1, subdivision (a), and did the arresting officer have a legal right to arrest her for this felony?"

After an extended discussion between the trial court and counsel about an appropriate response to the jury's question, the trial court decided to read to the jury the following modified instruction: "If you find plaintiff stated to

occupants of a building or a news reporter in the employ of a newspaper or radio or television station, that a bomb or other explosive has been or will be placed or secreted in any public or private place, knowing that the report is false, is guilty of a crime punishable by imprisonment in the state prison, or imprisonment in the county jail not to exceed one year."

[16] " ' " '[F]alse arrest' and 'false imprisonment' are not separate torts. False arrest is but one way of committing a false imprisonment . . . ." [Citation.]' (*Asgari v. City of Los Angeles* (1997) 15 Cal.4th 744, 752, fn. 3 [63 Cal.Rptr.2d 842, 937 P.2d 273].)" (*Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1048, fn. 6 [55 Cal.Rptr.3d 158].)

[17] The instruction to the jury on section 148.1, subdivision (a) read: "Any person who reports to any police officer, employee of an airline or employee of an airport, that a bomb has been placed in any public or private place, knowing that such report is false, is in violation of California Penal Code section 148.1(a), which is punishable as a felony."

police officers, employees of an airline or employees of an airport that a bomb was placed in a public or private place, you must find that there was reasonable cause to arrest the plaintiff. If you find that such facts are not true, you must find that there was not reasonable cause to arrest the plaintiff."

## B. *Reasonable or Probable Cause*[18]

Certain of plaintiff's claims, such as false arrest, were predicated on the allegation that the officers lacked probable cause to arrest her for a violation of section 148.1, subdivision (a). Defendants successfully opposed those claims at trial by arguing, inter alia, that the facts presented established probable cause for plaintiff's arrest. Plaintiff now challenges the legal sufficiency of the modified instruction on probable cause. Thus, we deal with the criminal law concept of probable cause in the context of a civil action for false arrest.

■ " 'The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In conformity with the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.' " (*People v. Thompson* (2006) 38 Cal.4th 811, 817 [43 Cal.Rptr.3d 750, 135 P.3d 3].) Penal Code section 836, subdivision (a) provides, "A peace officer may arrest a person in obedience to a warrant, or, . . . without a warrant, may arrest a person whenever any of the following circumstances occur: [¶] (1) The officer has probable cause to believe that the person to be arrested has committed a public offense in the officer's presence. [¶] (2) The person arrested has committed a felony, although not in the officer's presence. [¶] (3) The officer has probable cause to believe that the person to be arrested has committed a felony, whether or not a felony, in fact, has been committed."[19]

---

[18] The terms reasonable cause and probable cause as used in the context of an arrest appear to be interchangeable. (See, e.g., *People v. Ingle* (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577] ["Reasonable or probable cause for an arrest has been the subject of much judicial scrutiny and decision . . . ."].) We will use the term probable cause because that is the term used in the relevant portions of Penal Code section 836. (See, e.g., Pen. Code, § 836, subd. (a)(3) ["The officer has *probable cause* to believe that the person to be arrested has committed a felony . . . ."] (italics added).)

[19] As Penal Code section 148.1 provides for imprisonment in state prison, violation of that section qualifies as a felony (Pen. Code, § 17) even though the offense is a "wobbler"—i.e., it can also be punished as a misdemeanor. (See *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 901–902, fn. 7 [135 Cal.Rptr.2d 30, 69 P.3d 951] ["A wobbler is deemed a felony unless charged as a misdemeanor by the People or reduced to a misdemeanor by the sentencing court . . . ."].)

■ "Reasonable cause to arrest exists when the facts known to the arresting officer would lead a reasonable person to have a strong suspicion of the arrestee's guilt. (*People v. Mower* (2002) 28 Cal.4th 457, 473 [122 Cal.Rptr.2d 326, 49 P.3d 1067].) This is an objective standard. (*People v. Adair* (2003) 29 Cal.4th 895, 904–905 [129 Cal.Rptr.2d 799, 62 P.3d 45].)" (*O'Toole v. Superior Court* (2006) 140 Cal.App.4th 488, 511 [44 Cal.Rptr.3d 531].) "It is the right to arrest that is being tested. . . . The question with which we are concerned is not 'why did the officer want to arrest this particular defendant?' but rather 'was there reasonable cause to arrest this particular defendant?' The arresting officer's secret intentions, hopes, or purposes have nothing to do with the legality of the arrest. The legality [of the arrest] which is based upon reasonable cause is tested by objective standards . . . ." (*People v. McClure* (1974) 39 Cal.App.3d 64, 68 [113 Cal.Rptr. 815]; see *Gillan v. City of San Marino, supra*, 147 Cal.App.4th at p. 1045 ["Probable cause is measured by an objective standard based on the information known to the arresting officer, rather than a subjective standard that would take into account the arresting officer's actual motivations or beliefs . . . ."].) " ' "[S]ufficient probability [that a crime has been committed], not certainty, is the touchstone of reasonableness under the Fourth Amendment." ' " (*People v. Thompson, supra*, 38 Cal.4th at p. 820.)

■ In a civil action for false arrest, once a plaintiff establishes an arrest without a warrant, followed by imprisonment and damages, the burden shifts to the defendant to show a justification for the arrest. "Upon proof that an arrest and confinement occurred without process and that the plaintiff was damaged, the defendant has the burden of persuasion to prove that the arrest was justified. (*Cervantez v. J. C. Penney Co.* (1979) 24 Cal.3d 579, 592 & fn. 7 [156 Cal.Rptr. 198, 595 P.2d 975].)" (*Gillan v. City of San Marino, supra*, 147 Cal.App.4th at p. 1044.)

■ If the facts that gave rise to the arrest are undisputed, the issue of probable cause is a question of law for the trial court. (*Hamilton v. City of San Diego* (1990) 217 Cal.App.3d 838, 844 [266 Cal.Rptr. 215]; *Giannis v. City and County of San Francisco* (1978) 78 Cal.App.3d 219, 224–225 [144 Cal.Rptr. 145].) When, however, the facts that gave rise to the arrest are controverted, the trial court must instruct the jury as to what facts, if established, would constitute probable cause. "The trier of fact's function in false arrest cases is to resolve conflicts in the evidence. Accordingly, where the evidence is conflicting with respect to probable cause, ' "it [is] the duty of the court to instruct the jury as to what facts, if established, would constitute

probable cause." ' [Citations.] The jury then decides whether the evidence supports the necessary factual findings." (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163].)

Based on the foregoing authorities, defendants were *not required* to show that the facts known to the officers were sufficient to prove that plaintiff actually committed a crime. Rather, it was sufficient to show that the officers were aware of facts that would cause *a reasonable person* to suspect a crime had been committed. Under this objective standard, the officers' actual or subjective belief that plaintiff did or did not commit a crime is irrelevant to the probable cause analysis.

Officer Hayes testified that she arrested plaintiff for making a false report of a bomb. Thus, the determination of whether Officer Hayes had probable cause to arrest plaintiff required the trial court to instruct the jury as to what facts, if established, would constitute probable cause to arrest for a violation of section 148.1, subdivision (a). That process entailed explaining to the jury the elements of a violation of section 148.1, subdivision (a)—i.e., the necessary factual findings for a suspected violation—and relating those elements to the ultimate issue of probable cause. Accordingly, in conjunction with its original instruction on probable cause, the trial court also instructed the jury on the elements of section 148.1, subdivision (a). Based on the jury's question about the original probable cause instruction and the elements of section 148.1, subdivision (a), the trial court issued a modified instruction. It is the trial court's subsequent attempt to integrate the necessary factual findings for a suspected violation of the statute into the modified probable cause instruction that plaintiff now challenges on appeal.[20]

## C. *Elements of the Crime*

In support of her challenge to the legal sufficiency of the modified instruction, plaintiff takes issue with the language, "If you find plaintiff *stated* to police officers . . . ." (Italics added.) She emphasizes that section 148.1, subdivision (a) uses the term "reports" which, according to plaintiff, connotes more than making a mere "statement" to police officers, airline employees, or airport employees. Plaintiff also construes the statute to require a "true threat."[21] As plaintiff reads the statute, the trial court's instruction eliminated

---

[20] See *Mustafa v. City of Chicago* (7th Cir. 2006) 442 F.3d 544, 547–548 (action by plaintiff for false arrest in which court discussed elements of false bomb threat statute in connection with issue of probable cause).

[21] For First Amendment purposes, a true threat is made when the "speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." (*Virginia v. Black* (2003) 538 U.S. 343, 359 [155 L.Ed.2d 535, 123 S.Ct. 1536].) Later courts have differed over the precise meaning of a

the specific intent requirement, as well as the requirement that the listener interpret the remark seriously, and instead allowed the jury to conclude that the mere utterance of the word "bomb," without more, could constitute a violation of section 148.1, subdivision (a).

■ Plaintiff's challenge, directed at the modified probable cause instruction, focuses on the trial court's construction of section 148.1, subdivision (a). Thus, we must construe that provision.[22] " 'In construing a statute, our role is to ascertain the Legislature's intent so as to effectuate the purpose of the law. [Citation.] In determining intent, we must look first to the words of the statute because they are the most reliable indicator of legislative intent. [Citation.] If the statutory language is clear and unambiguous, the plain meaning of the statute governs. [Citation.]' (*People v. Lopez* (2003) 31 Cal.4th 1051, 1056 [6 Cal.Rptr. 3d 432, 79 P.3d 548].) In other words, if there is 'no ambiguity or uncertainty in the language, the Legislature is presumed to have meant what it said,' and it is not necessary to 'resort to legislative history to determine the statute's true meaning.' (*People v. Cochran* (2002) 28 Cal.4th 396, 400–401 [121 Cal.Rptr.2d 595, 48 P.3d 1148].)" (*People v. Licas* (2007) 41 Cal.4th 362, 367 [60 Cal.Rptr.3d 31, 159 P.3d 507].) "We begin by examining the statute's words, giving them a plain and commonsense meaning." (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129].)

■ The statute, as it relates to the facts of this case, has two essential elements. The first element covers "[a] person who reports to any peace officer . . . , employee[] of an airline . . . [or] employee[] of an airport . . . that a bomb or other explosive has been or will be placed or secreted in any public or private place . . . ." (§ 148.1, subd. (a).) In context, the use of the word "reports" does not, as plaintiff suggests, require a formal presentation.[23] It means relates or tells something to someone (see Webster's 3d New Internat. Dict., *supra*, p. 1925), as opposed to a comment that is not directed at anyone in particular or is merely overheard. There is no language in the

---

"true threat." (See, e.g., *U.S. v. Stewart* (9th Cir. 2005) 420 F.3d 1007 [discussing different tests]; *U.S. v. Romo* (9th Cir. 2005) 413 F.3d 1044, 1051 [reasonable person must foresee that recipient would interpret words as a serious threat]; *U.S. v. Cassel* (9th Cir. 2005) 408 F.3d 622, 633 [speaker subjectively intended speech as threat]; *Porter v. Ascension Parish School Bd.* (5th Cir. 2004) 393 F.3d 608, 616 [objectively reasonable person would understand words as intent to cause harm]; *People v. Stanley* (Colo.App. 2007) 170 P.3d 782, 788–789.)

[22] We review the construction of a statute de novo. (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 531 [85 Cal.Rptr.2d 257, 976 P.2d 808].)

[23] The definition of the noun "report" also includes "statement" or "account." (Webster's 3d New Internat. Dict. (2002) p. 1925.)

first element to suggest that the statement must be made in the form of a "true threat," such that a reasonable person in the position of the recipient of the statement would fear for his or her safety or the safety of others or that the speaker have the specific intent to have the listeners take the report seriously. All that is required by the plain language of the first element of the statute is a report that a bomb has been placed or secreted—nothing more.

■ Unlike the first element, the second element of section 148.1, subdivision (a), "knowing that the report is false," does require a specific state of mind, in that the person doing the reporting must know the statement is false. But that is the extent of the scienter requirement. Knowledge of the falsity of that which is reported is not the equivalent of a specific intent to cause fear or harm. Based on the plain language of the statute, it does not matter *why* the person who made the report did so. All that matters is that *the report was made* to one of the specified persons or entities, with knowledge that it was false.

■ " 'When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.' ([*People v.*] *Hood* [(1969)] 1 Cal.3d [444,] 456–457 [82 Cal.Rptr. 618, 462 P.2d 370].)" (*People v. Atkins* (2001) 25 Cal.4th 76, 82 [104 Cal.Rptr.2d 738, 18 P.3d 660]; see *People v. Stark* (1994) 26 Cal.App.4th 1179, 1182 [31 Cal.Rptr.2d 887].) ■ Section 148.1, subdivision (a) only describes a particular act—a false report that a bomb or other explosive has been placed or secreted—without reference to doing a further act or achieving a future consequence. Thus, the trial court was not required to instruct the jury concerning plaintiff's intent in making the bomb statements. As a general intent crime, the statute requires that the person intend to communicate that a bomb has been placed or secreted knowing that it has not been.[24]

■ Plaintiff's contention that section 148.1, subdivision (a) requires the making of a "true threat" is further undermined by the Legislature's definition of the term "threat" in other statutes that expressly include additional elements. (See, e.g., Code Civ. Proc., § 527.8, subd. (b)(2) [defining " '[c]redible threat of violence' " as "a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose"]; Pen. Code, § 139, subd. (c) [defining a "credible threat" as "a threat made with the intent and the apparent ability to carry out the threat so

---

[24] A person "whose involuntary epileptic fit caused him to" utter the words does not violate the statute. (*U.S. v. Cassel, supra,* 408 F.3d at p. 627.)

as to cause the target of the threat to reasonably fear for his or her safety or the safety of his or her immediate family"]; Pen. Code, § 646.9, subd. (g) [defining "credible threat" as "a verbal or written threat . . . made with the intent . . . and . . . with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family"]; see also Pen. Code, § 76, subd. (c)(5) [defining "threat" as "verbal or written threat or a threat implied by a pattern of conduct or a combination of verbal or written statements and conduct made with the intent and the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her immediate family"].) If the Legislature intended to include these additional elements of a civil or criminal threat in section 148.1, subdivision (a), it would have done so expressly, as it did in the cited statutes. (See *People v. Atkins, supra,* 25 Cal.4th at p. 84 [" 'Our analysis must . . . begin with an examination of the statutory language describing the proscribed conduct, including any express or implied reference to a mental state . . . .' "]; Code Civ. Proc., § 1858 ["In the construction of a statute . . . the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted . . . ."].) Because the Legislature omitted from section 148.1, subdivision (a) language similar to that used in the threat statutes, we cannot read the word "reports" to include the specific intent requirements of a civil or criminal threat.

Plaintiff contends that we should read further constitutional requirements into section 148.1, subdivision (a) because, she asserts, without doing so, the statute would be unconstitutional. Plaintiff's position is that the First Amendment to the United States Constitution requires that section 148.1, subdivision (a) be read to criminalize only "true threats." In *Watts v. United States* (1969) 394 U.S. 705 [22 L.Ed.2d 664, 89 S.Ct. 1399] and in *Virginia v. Black, supra,* 538 U.S. at pages 359–360, the United States Supreme Court recognized that the First Amendment did not apply to "true threats." First Amendment free speech protections do not extend to certain types of speech because such speech is " 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " (*R. A. V. v. St. Paul* (1992) 505 U.S. 377, 383 [120 L.Ed.2d 305, 112 S.Ct. 2538].)

 The concept of a "true threat" has no application here. Plaintiff was not arrested for making a threat. (See, e.g., Pen. Code, § 422 [prohibiting threats to commit a crime that will result in death or great bodily injury, made with the specific intent that the statement is to be taken as a threat, and which cause the person threatened to fear for his or her safety or the safety of an immediate family member].) She was arrested for making a false report of a bomb. As discussed above, section 148.1, subdivision (a) does not require that the speaker intend to cause fear or harm or that the report cause actual

fear or harm. The statute criminalizes falsely uttered words that by their very nature have the inherent potential to cause alarm or disruption if reported to one of the persons or entities identified in the statute. As such, the words prohibited by the statute are similar in nature to the false cry of "fire" in a crowded theater—the classic example provided by Justice Oliver Wendell Holmes, Jr.—which has been described as a *verbal act* that is not protected by the First Amendment. (*Schenck v. United States* (1919) 249 U.S. 47, 51–52 [63 L.Ed. 470, 39 S.Ct. 247]; see *People v. Bohmer* (1975) 46 Cal.App.3d 185, 199 [120 Cal.Rptr. 136]; *United States v. Rutherford* (2d Cir. 1964) 332 F.2d 444, 446; *United States v. Irving* (5th Cir. 1975) 509 F.2d 1325, 1330–1331; *State ex rel. RT* (La. 2001) 781 So.2d 1239, 1243.)[25] Because the making of a false bomb report to the specified persons or entities is not protected speech, the trial court was not required to read any "true threat" limitation into section 148.1, subdivision (a). (See *People v. Stanistreet* (2002) 29 Cal.4th 497, 510 [127 Cal.Rptr.2d 633, 58 P.3d 465] [in upholding statute criminalizing false reports of police misconduct, the court stated "the Constitution does not require us to tolerate . . . knowingly false statements of fact . . ."].)

That the words might be said sarcastically or jokingly, or might even be understood as such, does not provide constitutional protection to the falsely stated words involved here. Because of the nature of the words and the statutorily required recipients, the words should not be deemed protected under the circumstances. Neither the police nor the other persons or entities specified in the statute should be put in the position of having to speculate whether the person making the bomb report intended that it be taken seriously or as a joke.

■ The application of section 148.1, subdivision (a) is limited to reports to certain governmental, law enforcement, media, and transportation-related personnel. The statute thereby reflects a legislative determination that false bomb reports to the specified persons or entities are by their nature matters to be taken seriously. Thus, the actual effect on the person to whom the report is made is not an element of the crime. Even if it were, generally the recipients of such a report, because of their positions, would be reasonable in giving credence to that report.

Plaintiff's reliance on *Fogel v. Grass Valley Police Dept.* (E.D.Cal. 2006) 415 F.Supp.2d 1084 is misplaced. *Fogel* concerned a civil rights action and state law claims against a police department and police officers for an arrest for violations of a threat statute, as well as Penal Code section 148.1. The

---

[25] "For an audience member to falsely yell 'fire' in a crowded theater is quite different than for an actor to yell the same word in the same crowded theater while reciting the lines of a dramatic production." (*Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1166 [57 Cal.Rptr.3d 320, 156 P.3d 339].)

court observed that some of the words involved speech that was arguably political expression; the plaintiff claimed to have made the statements in issue to express his disagreement with the Patriot Act and the United States's involvement in the Middle East. (415 F.Supp.2d at p. 1086.) In denying the plaintiff's motion for summary judgment on the grounds that the speech involved was protected under the First Amendment, the court concluded that there was a triable issue of fact as to whether a reasonable person in the plaintiff's position would foresee whether his statements would be interpreted by his listeners as a true threat, as opposed to political hyperbole. (415 F.Supp.2d at p. 1087.) The court, however, did not address specifically section 148.1. Instead, the court granted the individual defendants' motion for summary judgment based on the qualified immunity doctrine and granted the department's motion on the grounds that there was "no . . . showing of an unconstitutional official policy." (415 F.Supp.2d at p. 1090.)

In the instant case, plaintiff does not attempt to justify her bomb remarks as any form of protected political expression nor, given the facts, could she. The statute here does not regulate "based on disapproval of the ideas expressed." (*Loshonkohl v. Kinder* (2003) 109 Cal.App.4th 510, 514 [135 Cal.Rptr.2d 114].) *Fogel v. Grass Valley Police Dept., supra*, 415 F.Supp.3d 1084, therefore, has no application in these circumstances.

Our construction of section 148.1, subdivision (a) is consistent with the construction given similar statutes in other jurisdictions. (See *People v. Barron* (2004) 348 Ill.App.3d 109 [283 Ill.Dec. 763, 808 N.E.2d 1051, 1055] [In upholding a conviction for making a bomb joke in an airport under a disorderly conduct statute, which prohibited transmitting a "false alarm" as to a concealed bomb, court said "an individual may be found guilty of felony disorderly conduct upon transmission of a false alarm, regardless of the intention of the speaker or the effect the words have upon the person receiving them . . . ."]; *Mustafa v. City of Chicago, supra*, 442 F.3d at p. 548 [In civil action for false arrest based on the statute at issue in *People v. Barron, supra*, 808 N.E.2d 1051, court held that there was probable cause to make the arrest because the statute applied "categorically to all false bomb threats; [and contained] no element limiting its application to *credible* bomb threats or to those threats that convince the listener"]; *State v. Berberian* (R.I. 1983) 459 A.2d 928, 931 ["It is clearly the intention of the Legislature to protect persons in this state not only from the placing of bombs but from the undesirable effects of the exercise of a macabre sense of humor by those who would make such false reports. . . . The statute is not aimed at pure speech, it is designed to prevent harmful and frightening verbal acts. It is not necessary, therefore, to examine the subjective intention of the author of the false report or the subjective reaction of the recipients. [¶] We recognize the unique vulnerability of aircraft, airports and public buildings to this kind of threat. The fears that may be engendered, the necessity to clear buildings, alter

schedules, and disrupt orderly proceedings amply support the Legislature in curbing such a substantive evil. The practical joker can create as much havoc as the sociopathic malefactor."]; but cf. *State ex rel. RT, supra,* 781 So.2d 1239 [court suggested that, under a statute making it a crime to make a false bomb report *to any person,* although specific intent on the part of the speaker was not required, the effect of the false bomb report on a reasonable person similarly situated to the recipient should be considered].)

Plaintiff contends that her comments about a bomb were sarcastic or made in frustration and that they were not intended to be taken seriously, nor were they taken seriously because, inter alia, her bags were not searched until hours after she made the comments. As discussed above, however, even if plaintiff's comments were not intended to be taken seriously or were not taken seriously, that does not change the analysis under section 148.1, subdivision (a) because neither plaintiff's intent in making the comments nor the actual effect of those comments on the persons who heard them is an element of the crime. Thus, the trial court did not err by not instructing the jury concerning plaintiff's intent in making the comments or the effect of the comments on those who heard them.

Plaintiff also contends that the modified instruction was erroneous because it failed to include the second element necessary for a violation of section 148.1, subdivision (a), i.e., that plaintiff *knew* her comments about a bomb were *false.* It is true that the trial court did not include the knowledge requirement in the modified instruction. But because that fact was not controverted, there was no reason to include it in the instruction. (See *Pool v. City of Oakland, supra,* 42 Cal.3d at p. 1069; com. to BAJI No. 7.66 (spring ed. 2007) p. 380.)

At trial, plaintiff disputed that she ever "reported" to anyone that there was a bomb in her bag. Thus, the trial court properly included that disputed fact in its modified instruction. But the evidence showed, and plaintiff did not deny, that her comments about a bomb—whether intended as sarcasm or not—were not true. Therefore, the trial court did not err by failing to instruct the jury concerning a fact, the existence of which was not in dispute.

D.–G.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 1002.

## DISPOSITION

The appeal as to United is dismissed, but United shall not recover costs on appeal. As to the remaining defendants, the judgment of the trial court is affirmed, and they are awarded their costs on appeal.

Turner, P. J., and Kriegler, J., concurred.

A petition for a rehearing was denied January 30, 2008, and on January 14, 2008, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 9, 2008, S161014.