FRANSON, J.
*326 *1125 Plaintiff James Davis was dismissed from his employment as a supervising juvenile correctional officer based on findings of insubordination, discourteous treatment of a subordinate, wrongfully assuming supervisorial duties over his wife despite several admonitions to the contrary, exaggerating the hours he worked on multiple time cards, and other misconduct. Davis's administrative appeal of his dismissal was denied by the Civil Service Commission (Commission) of the County of Fresno (County). Davis filed a petition for a writ of administrative mandamus requesting the superior court to set aside the Commission's decision. The superior court denied the petition.
On appeal, Davis contends County violated his constitutional due process rights by failing to provide him a copy of all materials upon which the disciplinary action was based prior to his Skelly hearing.[1] Davis also contends County's failure to produce complete copies of reports and witness interviews conducted during the internal affairs investigation into his alleged misconduct violated the Public Safety Officers Procedural Bill of Rights Act, Government Code section 3300 et seq. (POBRA).[2]
*1126 We conclude the materials delivered prior to Davis's Skelly hearing satisfied the requirements of due process applicable before disciplinary action is imposed. In contrast, we conclude County violated Davis's right under POBRA to receive "any reports or complaints made by investigators or other persons." (§ 3303, subd. (g).) We interpret the term "any reports" to include the incident reports and interview transcripts attached to a September 2012 memorandum prepared by a special probation investigator who looked into a retaliation complaint made by another officer against Davis. Davis's alleged discourteous treatment of this officer was one of the grounds for his dismissal.
The issue of the appropriate remedy for a violation of POBRA is committed to the broad discretion of the superior court. Here, the record does not compel this court, as a matter of law, to reinstate Davis with backpay. Furthermore, there exists a wide range of remedies and we make no comment as to the merits of any of the possible remedies the trial court might select. Therefore, we remand this matter to the superior court and direct it to decide in the first instance the appropriate remedy.
We therefore reverse the judgment.
FACTS
Davis worked 14 years for the California Highway Patrol before retiring due to a service-related injury. In September 2002, County hired Davis as a full-time juvenile probation officer. In June 2006, Davis was promoted to supervising juvenile correctional officer.
*327 Davis was selected as the probation department's employee of the month in March 2004 and September 2008. In October 2008, Davis filed a complaint with the Federal Bureau of Investigation (FBI) alleging a County employee had used excessive force against a juvenile inmate. Davis informed his supervisor of his complaint to the FBI.
In February 2009, Davis was placed on paid administrative leave for alleged misconduct. Without using progressive discipline, County terminated Davis's employment in December 2009. Davis contends County placed him on leave and then fired him in retaliation for filing the complaint with the FBI. In March 2010, the Commission overturned the termination, reinstated Davis to his former position, and found a suspension of six weeks (i.e., 240 *1127 hours) without pay was appropriate. Davis asserts the Commission made its decision after hearing County's case in chief and did not wait for him to present evidence.[3]
September 2012 Memo
On July 5, 2012, Lonny T. Blue, juvenile correctional officer II, was informed by other officers that Davis had instructed them to write incident reports because Blue had brought a juvenile out for recreation on the 4th of July even though the juvenile was on a "High Security 1" contract for having a pencil in his cell. Blue then prepared an incident report dated July 5, 2012, describing what the officers had told him.
On August 3, 2012, Blue filed an internal complaint alleging Davis was retaliating against him by making it difficult for him to carry out his duties and causing him stress. Blue attached a copy of his July 5, 2012, incident report to his complaint. Blue's complaint was investigated by Glenn Johnson, special probation investigator. Johnson asked Blue for additional information supporting his allegation of retaliation and Blue responded by email dated August 21, 2012. Johnson interviewed a number of officers, including Blue and Davis. Davis was interviewed on September 7, 2012.
On September 12, 2012, Johnson completed a memorandum to Linda Penner, chief probation officer, addressing Blue's complaint of retaliation (September 2012 Memo). The September 2012 Memo was 20 pages long without its attachments and described Johnson's investigation as follows:
"This investigation involved the review of numerous documents (each Tabbed for reference), and personal interviews (each transcribed and Tabbed for reference). Witness/interviewee statements are summarized below, however, it is suggested the full transcript be read for a complete review of the interview."
The materials placed under a particular tab might include incident reports, interview transcripts, and emails. For example, Tab 6 to the September 2012 Memo included a transcript of an interview with juvenile correctional officer Angie Marquez and an email to Marquez. It also may have included a copy of an incident report prepared by Marquez and dated July 6, 2012.
Other Events
On October 12, 2012, Davis forwarded to supervising juvenile correctional officer Anthony deLanda an email Davis received from program service *1128 manager Melissa *328 Madsen. The Madsen email stated a complaint had been made against Davis and directed him not to discuss the matter with anyone other than his chosen representative. As deLanda was not Davis's representative, Davis's forwarding the email to deLanda disobeyed Madsen's directions.
On October 22, 2012, Rick Chavez (who was later promoted to chief probation officer in 2013) observed Davis arrive at the parking lot at 4:13 p.m. Davis had been scheduled to work as watch commander and should have reported at 3:48 p.m. for briefing by the outgoing watch commander. Davis's timesheet reflected that he began work at 3:48 p.m. Subsequently, a private investigator was asked to verify Davis's arrivals and departures on three Sundays when Davis was scheduled to work from 7:48 a.m. until 4:00 p.m. On those Sundays, Davis submitted false timesheets.
On December 9, 2012, while on duty and logged onto the watch commander's computer, Davis completed a timesheet for his wife, a juvenile correctional officer. Previously, Davis had been provided a copy of the department's nepotism policy, directed not to supervise his wife, and counseled that his approval of his wife's timesheets was performing a supervisory function.
Administrative Leave and Investigation
On December 13, 2012, County placed Davis on administrative leave and initiated an internal affairs investigation into various allegations of misconduct. In April 2013, Davis was notified by mail that additional allegations of misconduct would be included in the investigation. The violations of policy alleged included incompetency, insubordination, neglect of duty, discourteous treatment of other employees, dishonesty, and fraud.
Special probation investigator Johnson was assigned to the matter and conducted "Internal Affairs Investigation #12-0012." Davis was interviewed on May 9, 2013. Johnson also interviewed Vince Ariz, a probation services manager who acted as Davis's supervisor at the juvenile detention facility; Sandra Hearnes, a supervising juvenile correctional officer; and Chavez, who had observed Davis's late arrival to work.
Internal Affairs Report
Johnson prepared a report for "Internal Affairs Investigation #12-0012" which was dated June 14, 2013, and sent to Penner (IA Report). The IA Report was 31 pages long without its attachments. Tab J to the IA Report was the September 2012 Memo, which addressed Blue's complaint of retaliation.
*1129 The IA Report's conclusions stated the "investigation identified numerous instances of misconduct on the part of Mr. Davis" and some occurrences violated more than one policy. To illustrate this point, the IA Report stated Davis "failed to timely review and submit [incident reports] pertaining to a specific assault on a minor who was injured and subsequently filed a Claim for Damages against the County. This misconduct can be viewed as an act of incompetency and neglect of duty." The IA Report also stated:
"The discourteous treatment of Officer Blue is supported by Mr. Davis receiving a clandestine E mail from SJCO Herrera singling out JCO Blue; not requesting JCO Blue's input regarding activities which occurred in a Pod supervised by Mr. Davis; having peer staff write reports about Officer Blue and telling the peer officers not to discuss the matter with Officer Blue; approving a staff's time sheet for overtime in order for that staff to avoid contact with Officer Blue without Administrative approval;
*329 and the reference to 'That Kid' in describing Officer Blue."
The IA Report recommended sustaining the allegations that Davis violated (1) County personnel rules, (2) administrative policies of the probation department, and (3) a County management directive relating to the completion of timesheets.
Notice of Disciplinary Action
On July 26, 2013, County gave Davis a notice of intended order for disciplinary action signed by Penner, who was still acting as chief probation officer,[4] and dated July 24, 2013. The notice included an unsigned copy of a 12-page proposed order and stated Davis could make an oral or written reply within five days. The proposed order stated the department had received numerous complaints of inappropriate conduct by Davis and several coworkers and an investigation determined Davis had (1) engaged in discourteous treatment of a subordinate employee; (2) violated directives regarding confidentiality of personnel investigations; (3) failed to review and submit reports as directed; (4) improperly engaged in supervision of his wife; and (5) failed to properly account for his working hours on his timesheets. As to the last of these allegations, paragraph 20 of the proposed order described four timesheets on which Davis falsely reported his time of arrival or departure from work.
Also on July 26, 2013, County provided Davis with a packet of information containing the IA Report and the September 2012 Memo, without attachments. County's decision to withhold the attachments is challenged in this writ proceeding as a violation of Davis's POBRA rights and his *1130 constitutional right to due process. One rationale County subsequently offered for excluding the attachments was that "[t]he attachments were not included in the packet provided to either Ms. Penner or Chief Chavez and were not considered by them in making the decision to discipline Mr. Davis."[5]
On August 14, 2013, a Skelly hearing was held. At the time of the Skelly hearing, Chavez was the chief probation officer, but he did not conduct the hearing because he witnessed some of the alleged misconduct by Davis. Penner was still employed by County and she conducted the hearing, but Chavez signed the order for disciplinary action issued after the hearing, following Penner's recommendation. The order was dated August 14, 2013, and stated Davis was dismissed from his position with County effective as of that date.
Administrative Appeal and Decision
On August 21, 2013, Davis completed a request for appeal. He admitted some of the allegations in the order of discipline (including paragraphs 7, 18, 20 & 22) and denied other allegations on the ground they were not true. Specifically, Davis admitted (1) he had acknowledged during the May 9, 2013, interview that his actions in sharing certain information with deLanda were not consistent with the directives he had been given; (2) he had been provided with a copy of the nepotism policy, counseled that he could not supervise his wife, and told approval of her timesheet constituted a supervisory function, yet he completed a timesheet for his wife on December *330 9, 2012; (3) he submitted false timesheets on three Sundays when his arrival and departure was observed by a private investigator; and (4) he had previously been disciplined with a suspension for discourteous treatment of others, failing to comply with policy, and dishonesty.
On November 5, 2013, a prehearing conference was held. The parties exchanged witness lists and the department provided copies of 28 possible exhibits. The prehearing officer directed Davis to provide his exhibit list and copies within a week. Davis requested that the department be ordered to disclose materials related to the investigation of complaints made against him. On November 20, 2013, the prehearing officer issued a letter addressing Davis's request for disclosure of materials. The letter directed the department to produce some documents and concluded other documents need not be disclosed because they were irrelevant, privileged or confidential. For instance, the letter referred to "a July 7, 2012 'IR ' and complaint filed by *1131 employee Dominguez-Marquez 'against Blue alleging use of profanity and discourteous/intimidating behavior ' " and denied Davis's request for the materials. Davis wanted the documents relating to the incident involving Blue and Marquez to impeach Blue.
On November 25, 2013, Davis's counsel sent a letter to opposing counsel about the copy of the IA Report provided to Davis. The letter stated Tab J to the IA Report contained the September 2012 Memo from Johnson to Penner regarding Blue's retaliation complaint, but did not include all the documents attached to the memo and submitted to Penner. The letter stated that, because of the significance of the charges involving Blue, "Davis is entitled to have all the documents presented to Chief Penner and which are referenced in [the September 2012 Memo] at pages 1-20 as Tab 2, 3, 4, 5, 6, 7, 8, 9, 10 and 11." The letter requested "a copy of the entire report submitted to Chief Penner by Johnson on September 12, 2012."
The next day, Davis's union representative sent a letter to County's attorney supporting Davis's request for documents. The representative's letter stated Davis's right to due process had been violated by the failure to produce the materials and, at the least, Davis should receive backpay from the date of his Skelly hearing (August 14, 2013) until his appeal was decided.
On November 27, 2013, Davis's counsel sent a letter to the prehearing officer and opposing counsel requesting the termination of the proceedings because of violations of Davis's Skelly rights and POBRA. Counsel representing County responded by refusing to provide the additional documents.
On December 3, 5, 6, and 18, 2013, hearings were held before the Commission. At the opening of the hearing, the Commission considered and denied Davis's motion to dismiss the proceeding due to the failure to produce documents.
On January 9, 2014, the Commission issued a notice of decision denying Davis's administrative appeal and confirming the probation department's termination of his employment. Davis requested written findings of fact and conclusions of law. On March 20, 2014, the Commission issued a 31-page decision stating its findings and conclusions, which became the final administrative decision on Davis's dismissal.
PROCEEDINGS
In May 2014, Davis filed a pleading consisting of a petition for writ of administrative mandamus and complaint for damages. In November 2014, *1132 Davis filed a first amended petition and complaint, which *331 was the operative pleading for the remainder of the action.
Violations Alleged
Davis alleged County's failure to produce documents violated the procedural due process rights that apply before a Skelly hearing and, in addition, violated the procedural due process rights that apply before the full due process hearing conducted by the Commission. In addition, Davis alleged the failure to produce the requested documents violated subdivision (g) of section 3303, which states a peace officer is entitled to "any reports and complaints."
Statement of Decision
On October 8, 2015, the superior court filed an order denying petition for writ of mandate and statement of decision. The court stated Davis's Skelly rights had not been violated because (1) Skelly does not require extensive prediscipline disclosure and (2) Skelly addresses the hearing and disclosures required prior to the initial taking of disciplinary action and, thus, ceases to be the relevant framework once the discipline has been imposed. As to the application of the disclosure requirements in subdivision (g) of section 3303, the court concluded the terms "reports" and "complaints" suggest a more formal presentation than the raw or original source materials from which a report may be drawn and, therefore, the statute did not require disclosure of the interview transcripts and investigative reports initially attached to the September 2012 Memo.
The superior court also addressed County's alternate argument that disclosure was not required because the materials were confidential. The court acknowledged the confidentiality provision in subdivision (g) of section 3303 and stated County had not established the confidential nature of the records at issue. Accordingly, the court stated it could not find the records were confidential.
Judgment and Appeal
In December 2015, the parties filed a stipulation for judgment on writ of administrative mandamus and complaint, which stated a judgment on the complaint could be entered solely on the grounds set out in the statement of decision and, if the appellate court overturned that decision regarding the denial of the writ, then the complaint for damages would be fully reinstated on remand.
In January 2016, a notice of entry of judgment or order was served and filed. Later that month, Davis filed a notice of appeal.
*1133 DISCUSSION
I. JUDICIAL REVIEW
A. Superior Court
The Commission's final decision on employee discipline is subject to judicial review pursuant to a petition for writ of administrative mandate. ( Code Civ. Proc., § 1094.5.) Pursuant to subdivision (b) of Code of Civil Procedure section 1094.5, the judicial review of a final administrative decision "shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." ( Code Civ. Proc., § 1094.5, subd. (b).) An abuse of discretion can occur three different ways: (1) "the respondent has not proceeded in the manner required by law," (2) the "decision is not supported by the findings," or (3) "the findings are not supported by the evidence." ( Code Civ. Proc., § 1094.5, subd. (b).) When a vested, fundamental right is affected by the administrative decision, the trial court must "exercise *332 its independent judgment on the evidence" and determine whether the findings are "supported by the weight of the evidence." ( Code Civ. Proc., § 1094.5, subd. (c) ; see San Benito Foods v. Veneman (1996) 50 Cal.App.4th 1889, 1895, 58 Cal.Rptr.2d 571, quoting Bixby v. Pierno (1971) 4 Cal.3d 130, 143-144, 93 Cal.Rptr. 234, 481 P.2d 242.)
Davis has not referred to these statutory provisions. However, his arguments that County violated his constitutional and statutory rights by failing to provide him with all reports and complaints made against him could be categorized as a failure to provide him with a fair trial or as a claim that County "has not proceeded in the manner required by law." ( Code Civ. Proc., § 1094.5, subd. (b).) Davis has not argued in this court that the findings were not supported by the weight of the evidence.
B. Appellate Court
An appellate court reviewing a final administrative decision examines the superior court's findings of fact to determine if the findings are supported by substantial evidence. ( Beckley v. Board of Administration (2013) 222 Cal.App.4th 691, 697, 166 Cal.Rptr.3d 51.) The appellate court independently reviews the superior court's determinations of questions of law. ( Ibid . )
II. DUE PROCESS RIGHTS BEFORE TERMINATION**
*1134 III. RIGHT TO REPORTS AND COMPLAINTS UNDER POBRA
A. Overview
1. Statutory Protections
Section 3303 sets forth protections that apply "[w]hen any public safety officer is under investigation and subjected to interrogation by his or her" employer in a matter that could result in discipline. Section 3303 is primarily concerned with the conditions under which "the interrogation shall be conducted," but also imposes a few requirements that apply after an interrogation. (See Pasadena Police Officers Assn. v. City of Pasadena (1990) 51 Cal.3d 564, 579, 273 Cal.Rptr. 584, 797 P.2d 608 ( Pasadena ) [disclosures required after the officer's interrogation].)
Here, Davis alleges County's failure to disclose information violated Government Code section 3303, subdivision (g), which provides in part: "The complete interrogation of a public safety officer may be recorded. If a tape recording is made of the interrogation, the public safety officer shall have access to the tape if any further proceedings are contemplated or prior to any further interrogation at a subsequent time. The public safety officer shall be entitled to a transcribed copy of any notes made by a stenographer or to any reports or complaints made by investigators or other persons , except those which are deemed by the investigating agency to be confidential." (Italics added.)
2. Supreme Court Decision
This statutory text was discussed by the California Supreme Court when it was designated subdivision (f) of section 3303. ( Pasadena , supra , 51 Cal.3d 564, 574-579, 273 Cal.Rptr. 584, 797 P.2d 608.) The court stated the subdivision "defines only disclosure requirements incident to an investigation ; it does not address the officer's entitlement to discovery in the event he or she is administratively charged with misconduct." ( Id . at p. 575, 273 Cal.Rptr. 584, 797 P.2d 608.) As to the timing of disclosures, the court concluded "the Legislature intended subdivision ( [g] ) to require law *333 enforcement agencies to disclose reports and complaints to an officer under an internal affairs investigation only after the officer's interrogation." ( Id . at p. 579, 273 Cal.Rptr. 584, 797 P.2d 608.) The court noted preinterrogation disclosure of reports and complaints was not fundamental to the fairness of internal affairs investigations and was not supported by the statute's language or purpose. ( Ibid . ) The court expressed concern that preinterrogation disclosure might undermine public confidence in its police force and implied such a disclosure might hamper the investigation by allowing the officer being investigated to craft answers that fit or explained the evidence. ( Ibid . ) As a result, the court reversed the superior court's preliminary injunction, which prohibited the police department from interrogating an officer until it had provided him with its notes from the interview of another officer. ( Id . at pp. 571, 580, 273 Cal.Rptr. 584, 797 P.2d 608.) *1135 In Pasadena , our Supreme Court noted POBRA does not define " 'reports' " or " 'complaints.' " ( Pasadena , supra , 51 Cal.3d at p. 575, 273 Cal.Rptr. 584, 797 P.2d 608.) The court did not need to decide whether the notes of the interview of another officer were covered by the statutory terms because the police department did not raise that issue. ( Ibid . ) Thus, Pasadena is not authority for how those statutory terms should be interpreted and applied to the officer interviews at issue in this appeal.
3. Court of Appeal Decisions
The meaning of the terms "reports" and "complaints" used in section 3303, subdivision (g) was addressed by the Fourth District in San Diego Police Officers Assn. v. City of San Diego (2002) 98 Cal.App.4th 779, 120 Cal.Rptr.2d 609 ( San Diego Police ). Three years later, the Sixth District considered the meaning of the terms in Gilbert, supra, 130 Cal.App.4th 1264, 31 Cal.Rptr.3d 297.[7]
In San Diego Police , the city argued the term " 'reports' " was clear and unambiguous and referred only to the final written report of the investigator. ( San Diego Police , supra , 98 Cal.App.4th at p. 783, 120 Cal.Rptr.2d 609.) Based on this interpretation, the city concluded "notes and tape recordings that were the precursors of the final written report are beyond the scope of the statutorily mandated disclosable materials." ( Ibid . ) The court rejected the city's interpretation, stating the words of the statute referred "to 'any reports or complaints,' and those words do not limit the officer's receipt of information to the final written report of the investigator." ( Ibid . ) Thus, the court was unwilling to interpret the word "any" to mean "final." Instead, the court concluded the statutory "reference to reports and complaints provides officers with protections similar to those enjoyed by criminal defendants, including the rights to raw notes and tape-recorded statements of witnesses preserved by City." ( Id . at p. 785, 120 Cal.Rptr.2d 609.)
In Gilbert , the Sixth District disagreed with the statutory interpretation adopted in San Diego Police . As to the statutory text, the court stated:
*334 "In the context of an investigation, a 'report' would be generally defined as a detailed account or statement (Merriam-Websters Collegiate Dict. (10th ed. 2001) p. 990) and a 'complaint' would be generally defined as 'a formal allegation against a party' (id . at p. 234). Both 'report' and 'complaint' suggest a more *1136 formal presentation than the raw or original source materials from which a report may be drawn. This construction is consistent with the objectives of [POBRA]." ( Gilbert , supra , 130 Cal.App.4th at p. 1286, 31 Cal.Rptr.3d 297.)
On the subject of investigator notes, the Sixth District stated:
"The only 'notes' to which such officer is expressly entitled under section 3303, subdivision (g), are the 'notes made by a stenographer,' who was implicitly present at the officer's interrogation. Fair treatment of such officer does not require that all the material amassed in the course of the investigation, such as raw notes, written communications, records obtained, and interviews conducted, be provided to the officer following the officer's interrogation. Nothing in [POBRA's] language or legislative history reveals a legislative intent to provide an officer who is the subject of an administrative internal affairs investigation with broad statutory discovery rights similar to those held by criminal defendants." ( Gilbert , supra , 130 Cal.App.4th at pp. 1286-1287, 31 Cal.Rptr.3d 297.)
As to reports made by persons other than the agency's investigators, the Sixth District concluded those reports were covered by the language of section 3303, subdivision (g). ( Gilbert , supra , 130 Cal.App.4th at p. 1287, 31 Cal.Rptr.3d 297.) The court stated that the mere fact a report originated from a criminal investigation, either by the employing public safety department or an outside agency, does not excuse the employing "department from making such report available where it has been expressly made part of the department's internal affairs investigation of an officer." ( Ibid . )
B. Issue Presented
The specific issue of statutory construction presented in this appeal has not been addressed in a published decision. We frame that issue as follows: Does the term "report" used in subdivision (g) of section 3303 encompass materials attached to an internal affairs investigation report?
We conclude that, under the circumstances presented in this case, the attachments were part of a report. Therefore, County's failure to produce the attachments violated section 3303, subdivision (g).
C. Analysis
For purposes of this discussion, the documents involved in the proceedings against Davis can be organized into three tiers. The first two tiers consist of documents provided to Davis. The third tier are the documents that were not provided.
*1137 1. Documents Provided: IA Report and September 2012 Memo
The first tier is the IA Report. In July 2013, County provided Davis of copy of the IA Report. County does not dispute this disclosure was required by subdivision (g) of section 3303, which states the "officer shall be entitled to ... any reports ... made by investigators or other persons."
The second tier document is the September 2012 Memo prepared by Johnson and delivered to Penner to address Blue's complaint that Davis was retaliating against him. County included a copy of the September 2012 Memo in the packet provided Davis in July 2013. We conclude the *335 September 2012 Memo qualifies as a report made by an investigator for purposes of subdivision (g) of section 3303. First, the September 2012 Memo was prepared by Johnson, whose job title was "Special Probation Investigator." Thus, it was "made by investigators" within the meaning of subdivision (g) of section 3303. (See § 13 [plural includes the singular].) Second, the contents of the September 2012 Memo demonstrate it was a report. It described Blue's allegations and summarized Johnson's investigation, which "involved the review of numerous documents (each Tabbed for reference), and personal interviews (each transcribed and Tabbed for reference)." In addition, the September 2012 Memo was delivered to Penner, the chief probation officer at the time. Thus, even under the view that a "report" is a formal presentation, the September 2012 Memo qualifies as a report for purposes of section 3303, subdivision (g). (See Gilbert , supra , 130 Cal.App.4th at p. 1286, 31 Cal.Rptr.3d 297.)
2. Documents Not Provided: Attachments
The third tier of documents consist of the attachments to the September 2012 Memo, which Johnson tabbed for reference. Those documents included incident reports completed by various juvenile correctional officers and transcripts of officer interviews conducted during Johnson's investigation into Blue's complaint. We conclude the attachments were a part of the "report" for purposes of section 3303, subdivision (g). First, the September 2012 Memo stated it contained summaries of the witness statements, but "suggested the full transcript be read for a complete review of the interview." Thus, the author believed the attachments were useful to a full understanding of the matter addressed. Second, providing officers with a copy of attachment to an investigative memorandum helps assure the integrity of the report because the officer will be able to check the source documents to determine if they are accurately described in the memorandum. Thus, interpreting the term "report" to include attachments furthers POBRA's purpose of promoting stability, integrity and public confidence in law enforcement. (See § 3301 [legislative findings and declarations]; Pasadena , supra , 51 Cal.3d at p. 572, 273 Cal.Rptr. 584, 797 P.2d 608 [POBRA's procedural protections allow internal affairs investigations to be conducted fairly, which helps maintain the police force's efficiency and integrity].)
*1138 One way to analyze what documents are included in a "report" is to ask which system of disclosure would generate the most public confidence-a system where attachments are withheld from officers or a system where attachments are provided to officers. The answer is obvious. Withholding information would diminish public confidence, while providing the attachments would promote confidence. (See Common Cause v. Stirling (1981) 119 Cal.App.3d 658, 664, 174 Cal.Rptr. 200 [sunlight is said to be the best of disinfectants].) Therefore, we conclude the attachments were part of a report that County was required to provide under section 3303, subdivision (g). Accordingly, we need not address the split of authority and decide whether the interview transcripts and incident reports would have been covered by the statute if they had not been attached to the September 2012 Memo.
D. Constitutional Question
Davis contends he has raised questions about whether the constitutional due process requirements were satisfied both before and after his Skelly hearing. Davis argues the failure to provide complete documentation, besides violating POBRA, also violated the constitutional requirements *336 that apply to post-termination evidentiary hearings, like the one conducted by the Commission.
Having concluded POBRA was violated, we do not reach the constitutional questions, except to conclude that compliance with POBRA's procedural protections relating to document disclosure satisfies the requirements of procedural due process that applied prior to the Commission's hearing. (See generally, Berglund v. Arthroscopic & Laser Surgery Center of San Diego, L.P. (2008) 44 Cal.4th 528, 538, 79 Cal.Rptr.3d 370, 187 P.3d 86 [common practice to construe statutes, when reasonable, to avoid constitutional questions].)
E. Remedy
1. Contentions
The parties dispute how to remedy the violation of POBRA's procedural protections. Davis argues that reinstatement with backpay is the appropriate remedy. In contrast, County argues that (1) exclusion of the remainder of the September 2012 Memo would be the appropriate remedy and (2) reinstatement with backpay is not appropriate if the employer can show the same result would have occurred in the absence of the statutory violation. County further argues that sending the matter back to the Commission for another hearing is not necessary because no change in outcome would result and Davis had a full and fair opportunity at the previous hearing.
*1139 2. Statutory Provisions
Section 3309.5, subdivision (a) states "[i]t shall be unlawful for any public safety department to deny or refuse any public safety officer the rights and protections guaranteed to him or her by [POBRA]." Subdivision (c) of this statute provides that the superior court shall have initial jurisdiction over any proceeding brought by an officer for alleged violations of POBRA. The remedies for a POBRA violation are addressed in subdivisions (d) and (e) of section 3309.5.
"In any case where the superior court finds that a public safety department has violated any of the provisions of this chapter, the court shall render appropriate injunctive or other extraordinary relief to remedy the violation and to prevent future violations of a like or similar nature, including, but not limited to, the granting of a temporary restraining order, preliminary injunction, or permanent injunction prohibiting the public safety department from taking any punitive action against the public safety officer." (§ 3309.5, subd. (d)(1).)
This provision grants superior courts broad discretion to fashion appropriate equitable remedies to redress violations of POBRA and to deter future ones. ( Williams v. City of Los Angeles (1988) 47 Cal.3d 195, 203, 252 Cal.Rptr. 817, 763 P.2d 480.) By enacting this provision, the Legislature determined the task of formulating a remedy was best left to the courts on a case-by-case basis. ( Ibid . )
The remedy of damages is addressed in subdivision (e) of section 3309.5. It provides for the imposition of a $25,000 civil penalty if the department maliciously violated POBRA with the intent to injure the officer. In addition, it states: "If the court so finds, and there is sufficient evidence to establish actual damages suffered by the officer whose right or protection was denied, the public safety department shall also be liable for the amount of the actual damages." (§ 3309.5, subd. (e).)
3. Remand
The information available to this court does not include the documents that were withheld from Davis in violation of POBRA.
*337 Consequently, we have not been able to assess the impact their disclosure might have had on the administrative proceedings. As a result, we conclude the documents should be provided to Davis and his counsel before they present arguments to the trial court about "appropriate injunctive or other extraordinary relief to remedy the violation" of POBRA. (§ 3309.5, subd. (d)(1).) Once the documents have been provided to Davis and the parties have been given an opportunity to present arguments about their impact, then the trial court will have information relevant to exercising the broad discretion granted by POBRA and *1140 determining what injunctive or other extraordinary relief, if any, is "appropriate" to remedy County's POBRA violation and deter future violations.
County has argued that reinstatement, backpay and a rehearing before the Commission can be eliminated as appropriate relief under POBRA because the failure to disclose information related to Blue's retaliation complaint against Davis did not taint the Commission's decision to terminate Davis's employment for just cause. Counsel for Davis disagreed with this assessment, arguing the Commission heard testimony about the Blue matter and that testimony may have poisoned the well. Counsel for Davis argues he was limited in his ability to cross-examine the witnesses who testified because he did not have the attachments, which included transcripts of Johnson's personal interviews of the witnesses.
County's argument is based in part on the Commission's express findings that (1) Davis's "acts of insubordination and/or incompetence ... are all individually and separately sufficient to warrant termination" and (2) Davis's "dishonesty in the submission of multiple time card entries ... is solely by itself sufficient to warrant his termination." In response, Davis argues that, despite the wording of these findings, the Commission still could have been prejudiced by the testimony about the Blue matter. The arguments presented by the parties strengthen our conclusion that the question of appropriate remedy, which includes whether the matter should be remanded to the Commission, are best left for the trial court to decide after the withheld documents have been delivered to Davis and his attorney.
Furthermore, regardless of how this court dealt with the question of mandamus relief, a remand would be necessary to determine whether Davis is entitled to any relief under his complaint, which requests damages, civil penalties and attorney fees.[8] The fact that the trial court is in the best position to coordinate the relief granted in any writ of mandate, with the remedies awarded under the complaint, provides further support for our decision to remand the question of mandamus relief for further proceedings. (See Code Civ. Proc., §§ 43, 906 [discretionary authority of reviewing court in formulating relief]; cf. Williams v. City of Los Angeles, supra, 47 Cal.3d at p. 205, fn. 5, 252 Cal.Rptr. 817, 763 P.2d 480 [superior court abused discretion in ordering officer reinstated and precluding all use of the statements obtained in violation of POBRA; issue of entitlement to backpay for violation of Skelly rights left to be resolved on remand].)
*1141 IV. IMPARTIALITY OF INITIAL DECISION MAKER***
DISPOSITION
The judgment is reversed. The superior court is directed to vacate its order *338 denying the writ petition and issue an order directing County to provide Davis with a copy of the documents attached to the original September 2012 Memo. After the parties have been given a reasonable opportunity to review and present arguments related to those documents, the trial court shall conduct such further proceedings as it deems necessary (1) to determine the appropriate remedy or remedies to be included in any writ of administrative mandamus issued by the court and (2) to resolve the complaint, which shall be reinstated in accordance with the parties' stipulation.
Davis shall recover his costs on appeal.
WE CONCUR:
DETJEN, Acting P.J.
PEÑA, J.

"Skelly hearing" refers to the predisciplinary administrative hearing required by Skelly v. State Personnel Bd. (1975) 15 Cal.3d 194, 124 Cal.Rptr. 14, 539 P.2d 774 (Skelly ), which is described in part II.A., post .

All unlabeled statutory references are to the Government Code.

In October 2010, after the Commission's decision, Davis filed a civil complaint against County, alleging retaliation related to the FBI complaint and wrongful discharge in violation of public policy. In September 2017, counsel for Davis filed a notice with the superior court stating the entire case had been settled.

Penner retired as chief probation officer in March 2013.

This post hoc rationale about documents not being considered is dubious because it relies on facts that had yet to occur when the documents were delivered to Davis. Accordingly, we are reluctant to incorporate "actual reliance by a decision maker" into the test for whether a document is a "report" for purposes of POBRA and the disclosure requirement in section 3303, subdivision (g).

See footnote *, ante .

In addition to the POBRA decisions, the term "reports" has been interpreted in cases involving other statutes. For example, when interpreting a Penal Code section making it a crime to falsely report a bomb, the Second District stated the verb "reports" was not limited to making a formal presentation, but meant "relates or tells something to someone." (Levin v. United Airlines Inc. (2008) 158 Cal.App.4th 1002, 1020, 70 Cal.Rptr.3d 535.) The court also stated "the noun 'report' also includes 'statement' or 'account.' " (Id . at p. 1020, fn. 23, 70 Cal.Rptr.3d 535.)

The parties stipulated that the complaint would be reinstated if the trial court's denial of the petition for writ of administrative mandamus was overturned.

See footnote *, ante .