[No. D046406. Fourth Dist., Div. One. Feb. 8, 2006.]

In re P.C. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
ANDREW C. et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication with the exception of part III.

**COUNSEL**

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant Andrew C.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant Jamie C.

John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Suzanne F. Evans, under appointment by the Court of Appeal, for Minors.

OPINION

**McDONALD, J.**—Andrew and Jamie C. (Parents) appeal a judgment terminating their parental rights to their children, P.C. and G.C. Parents argue the exception to termination of parental rights under Welfare and Institutions Code section 366.26, subdivision (c)(1)(D) is unconstitutionally vague.[1] Nevertheless, they assert section 366.26, subdivision (c)(1)(D) precludes termination of parental rights because there was insufficient evidence to support the court's finding the maternal grandfather (Grandfather) was willing to adopt the children. Parents further assert there was insufficient evidence to support the court's finding the beneficial parent-child relationship exception to termination of parental rights under section 366.26, subdivision (c)(1)(A) did not apply.

We conclude substantial evidence supports the trial court's determination the exceptions under section 366.26, subdivision (c)(1)(A) and (D) did not preclude termination of parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2003 three-year-old P.C. and four-month-old G.C. were removed from parental custody after Jamie slapped P.C. in the face and pushed him into a shopping cart. Store officials stopped Jamie on suspicion of shoplifting and found methamphetamine in G.C.'s diaper bag. Jamie admitted she "smoked crystal" earlier that day.

The San Diego County Health and Human Services Agency (Agency) filed a petition under section 300, subdivisions (a) and (b) alleging P.C. was at substantial risk of serious physical harm or illness because of Jamie's excessive physical discipline and drug abuse and Andrew's inability to protect him. Agency alleged under section 300, subdivisions (b) and (j) that G.C. was also at substantial risk of serious physical harm or illness.

At the time the children were detained, Andrew was deployed with the United States Navy. He obtained early return and was present at the combined jurisdiction and disposition hearing. Parents submitted to jurisdiction and the children's placement in foster care. The court ordered a reunification plan and granted Agency the authority to return custody of the children to Parents on a 60-day trial visit.

P.C. had behavioral problems in foster care. Four caretakers, including his paternal grandparents, concluded they could not adequately care for him

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified. Rule references are to the California Rules of Court.

and G.C. and requested the children be removed from their care. In October 2003, instead of placing P.C. for a fifth time in foster care, Agency allowed him to return for an extended visit to Parents, who were close to completing their case plans. In November 2003, at the six-month review hearing, the court returned both children to Parents' custody with ordered family maintenance services.

In April 2004 Agency filed a supplemental petition under section 387, alleging Andrew was no longer able to adequately care for the children. Andrew was detained in the United States Navy brig after pleading guilty to charges of methamphetamine possession and use, providing a false official statement and being absent from his unit. Andrew admitted he was a "heavy user of methamphetamine" when he was younger and had been using "on [and] off." Jamie acknowledged she began using methamphetamine at age 16 and, before she began treatment, used as often as every day. Jamie successfully completed a drug treatment program in April 2004 and entered an aftercare program. However, she too relapsed.

Jamie and Andrew's relationship was historically volatile, and domestic violence continued after the children were returned to their custody. In February 2004 Andrew threw a peanut butter jar at Jamie, bruising her. P.C. reported "when daddy hits mommy, she sits on the couch and cries and I go and hug her." P.C.'s behavior deteriorated. School personnel reported he was defiant, aggressive and out of control. Jamie was approximately seven weeks pregnant and appeared "frazzled." At the second disposition hearing, the court allowed Jamie to retain custody of the children on the condition Andrew remain out of the home.

In May 2004 Jamie and the children became homeless after Andrew was dishonorably discharged from the United States Navy. The children were placed in respite care. After Jamie obtained assistance from the United States Navy, she and the children stayed in a motel. Agency investigated reports Andrew was living with them. A motel neighbor said she heard Jamie screaming and Andrew beating her. P.C. asked a social worker "if someone could tell daddy not to hit his mommy anymore." In July 2004 Agency detained the children and filed a second section 387 supplemental petition. After the children were removed from parental custody, Jamie and Andrew tested positive for methamphetamine.

In August 2004, at the third disposition hearing, the court terminated reunification services and referred the matter to a section 366.26 permanency plan hearing (permanency hearing). By that time, each child had been in six foster care placements. After a positive visit with the children in September 2004, Parents moved out of San Diego County. In late October 2004 Jamie

gave birth to another son. Parents' visitation with the children became less frequent because of the distance and expense of travel and because Parents feared Agency would remove the baby from their custody. By December 2004, P.C.'s behavior had stabilized in foster care. He and G.C. both appeared happy and well-adjusted.

On December 7, 2004, at the initial permanency hearing, Agency recommended termination of parental rights and adoption. Parents submitted on the report. The court did not determine if the children were adoptable but found adoption was in the children's best interests and no exceptions to termination of parental rights applied. The court continued the permanency hearing for 60 days to allow Agency to find an adoptive home for the children, either with a relative or in foster care. The children's attorney, Jeanette Day, requested Agency evaluate Grandfather's home.

In January 2005 the children were placed with Grandfather. Grandfather asked Parents to forgo visitation until he established a relationship with the children. The social worker reported the placement was "going very well." Grandfather told the social worker he preferred to remain the children's "Grandpa" but would not insist on guardianship for fear of losing his grandchildren to an adoptive placement. He was committed to offering the children a permanent and stable home.

On March 2, 2005, at the continued permanency hearing, Day informed the court Grandfather might prefer guardianship over adoption. The court set that issue for trial. Andrew requested a contested hearing on the issue of the beneficial parent-child relationship exception to termination of parental rights under section 366.26, subdivision (c)(1)(A). The court instructed Andrew to file a section 388 petition and said it would include that issue at trial if Andrew alleged changed circumstances. The court granted Andrew a hearing on his section 388 petition.[2]

On March 7, 2005, county counsel asked the court to set aside its findings of December 7, 2004, because "technically the adoptability finding must precede the [section 366.26, subdivision] (c)(1)(A) exception finding." On March 9, 2005, the court determined to hear the matter anew as a contested permanency hearing under section 366.26. Agency agreed to disregard the section 388 petition and reassume the burden of proof to support termination of parental rights.

Social worker Larks testified Parents visited the children approximately once every other week from September 2004 until October 2004, when

---

[2] Andrew's section 388 petition is not in the appellate record.

visitation stopped. Larks observed one visit in September 2004. P.C. called out "mommy" and "daddy" when he first saw Parents. Parents were affectionate with the children. However, in Larks's opinion, the relationship between Parents and children waned after the children were removed from Jamie's custody in July 2004. At Grandfather's request, Parents did not visit the children after their placement with him in January 2005. Larks concluded P.C. and G.C. knew their father and mother but did not look to them for day-to-day care or interaction.

Larks testified P.C. was an adoptable child. He was healthy, friendly, affectionate and engaging. G.C. also was adoptable. Both children would benefit from permanency, consistency and a sense of belonging. Larks believed adoption to be a more binding commitment than guardianship. In the event Grandfather was unable to adopt the children, she could ensure the children remained together in an adoptive home. Larks did not believe termination of parental rights would be emotionally detrimental for either child.

Grandfather believed Parents needed his help with the children because they had become homeless, did not have a support system in San Diego, and needed more time to stabilize than the dependency system allowed. He was aware of only one incident concerning Andrew's drug use. Grandfather hoped he would be able to maintain a guardianship to allow Parents the opportunity to raise the children after their situation stabilized. Grandfather thought P.C. would suffer if Parents' rights were terminated. He tucked P.C. into bed every night. P.C. missed his father and mother and was having a difficult time adjusting. The children loved their parents.

Grandfather was asked if he would be willing to adopt the children were the court to terminate parental rights, and he replied, "Of course." Grandfather said he was told he had no choice in the matter: Larks, Day, and others informed him the children were "going to be adopted one way or the other." Grandfather strongly believed it was better for the children to be with him rather than in a nonrelative adoptive home.

Andrew testified he and P.C. shared a strong bond. He had not visited the children recently. Grandfather gave him a set of guidelines to follow and he agreed it was the right thing to do. He and G.C. shared a strong bond and the children were bonded to each other and to Jamie.

After Jamie moved from San Diego, she visited the children every other week and telephoned them every night. She last saw the children in October 2004. She did not visit after the baby was born because she was afraid the social worker would detain him. The baby was not exposed to drugs at birth and remained in her care.

The court believed Grandfather minimized the children's exposure to Parents' "extremely chaotic environment." The children, especially P.C., needed stability and that need outweighed their love for Parents. The court did not believe guardianship reflected a permanent commitment to a child. Adoption was in the children's best interests and no exceptions under section 366.26, subdivision (c)(1)(A), (D) precluded termination of parental rights. The court was concerned visitation would be detrimental to the children but deferred to Grandfather the decision on contact between the children and Parents. The court found the children were adoptable and terminated Jamie's and Andrew's parental rights to the children.

Andrew filed a timely notice of appeal. Jamie filed a notice of appeal within the timelines set forth by rule 37(d)(4).

## DISCUSSION

Parents assert the court erred when it terminated parental rights and freed the children for adoption. They argue they and the children shared a beneficial parent-child relationship sufficient under section 366.26, subdivision (c)(1)(A) to preclude termination of parental rights. Parents also contend Grandfather was unwilling to adopt the children and the court should have applied section 366.26, subdivision (c)(1)(D) to preclude termination of parental rights. Notwithstanding their argument to apply the section 366.26, subdivision (c)(1)(D) exception, Parents argue the subdivision is unconstitutionally vague because the term "exceptional circumstances" is not defined and can encompass countless situations, so that "reasonable [persons] differ greatly as to the meanings to be ascribed to the term . . . ." (*In re Newbern* (1960) 53 Cal.2d 786, 795 [3 Cal.Rptr. 364, 350 P.2d 116].)

Agency argues this court does not have jurisdiction to hear Jamie's appeal because she filed the notice of appeal "three days late." It further contends Parents' claims under section 366.26, subdivision (c)(1)(D) are forfeited because at trial Parents did not raise a constitutional challenge to the

subdivision and did not object to the sufficiency of the evidence supporting the court's finding that the subdivision (c)(1)(D) exception to termination of parental rights did not apply.

On the merits, Agency asserts substantial evidence supports the court's findings that the exceptions to termination of parental rights under section 366.26, subdivision (c)(1)(A) and (D) did not apply. Agency argues section 366.26, subdivision (c)(1)(D) is not unconstitutionally vague because the phrase "exceptional circumstances" is sufficiently certain by its plain meaning and "reference to other definable sources."

I

## Timeliness of Appeal

Agency contends Jamie's appeal is not timely because she filed it more than 60 days after the rendition of the judgment she appeals. Jamie asserts she filed a timely notice of appeal.

Rules 37 through 38.6 specifically govern appeals in dependency cases under the Welfare and Institutions Code. Rule 37 states in part:

"[(d)](1) Except as provided in (2) and (3), a notice of appeal must be filed within 60 days after the rendition of the judgment or the making of the order being appealed. . . . [¶] . . . [¶]

"(4) If an appellant timely appeals from a judgment or appealable order, the time for any other party to appeal from the same judgment or order is extended until 20 days after the superior court clerk mails notification of the first appeal."

Judgment was rendered March 9, 2005. On May 6, 2005, Andrew timely filed a notice of appeal. Rule 37(d)(4) extends the time for another party to file an appeal from the same judgment for 20 days after notification of the first notice of appeal; here, May 26, 2005. Jamie filed a notice of appeal on May 11, 2005. Her appeal is timely. (Rule 37(d)(4).)

II

*Forfeiture*

Agency contends Parents forfeited their right to challenge on appeal the constitutionality of section 366.26, subdivision (c)(1)(D) by not raising the issue at trial.

"As a general rule, a new theory may not be presented for the first time on appeal unless it raises only a question of law and can be decided based on undisputed facts." (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 983 [105 Cal.Rptr.2d 88]; see *People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 195 [96 Cal.Rptr.2d 463, 999 P.2d 686].) Here, the meaning of the phrase "exceptional circumstances" does not implicate any disputed fact. When the facts are not disputed, the effect or legal significance of those facts is a question of law. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].) A question of law is not subject to the doctrine of forfeiture. (*People v. Butler* (1980) 105 Cal.App.3d 585, 588 [164 Cal.Rptr. 475]; *Ward v. Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].) Parents' right to challenge the constitutionality of the statute is not forfeited on appeal.

Agency urges us to apply the principle of forfeiture as a ground to avoid addressing the constitutional issue raised here. As a general rule constitutional issues are resolved on appeal only if absolutely necessary. (*People v. Marsh* (1984) 36 Cal.3d 134, 144 [202 Cal.Rptr. 92, 679 P.2d 1033]; *Estate of Johnson* (1903) 139 Cal. 532, 534 [73 P. 424].) However, we are not persuaded by Agency's assertion the constitutional challenge "can be determined on grounds of forfeiture rather than on the constitutional issue itself, and this Court need not, and should not, consider appellant's constitutional challenge." Forfeiture is a legal principle, not a legal ground.[3] Because the principle of forfeiture does not apply to a question of law, it is inappropriate for the purpose of defeating an inquiry into the constitutionality of a statute.

Agency also argues Parents' challenge to the sufficiency of the evidence was forfeited because Parents did not state specifically "the section 366.26, subdivision (c)(1)(D) exception precluded adoption." The general principle of forfeiture prohibits parties from addressing on appeal issues not raised at trial.

---

[3] A ground is defined as "[t]he reason or point that something (as a legal claim or argument) relies on for validity." (Black's Law Dict. (8th ed. 2004) p. 723, col. 1.)

However, the argument that a judgment is not supported by substantial evidence is an "obvious exception to the rule." (*Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17 [92 Cal.Rptr. 704, 480 P.2d 320].)

■    Here, the parties litigated the applicability of section 366.26, subdivision (c)(1)(D). Although the parties did not refer to the exception by its subdivision heading, the exception was raised by minor's trial counsel and Parents and considered by the court.[4] The issue is not forfeited on appeal.

III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Huffman, Acting P. J., and Nares, J., concurred.

**McDONALD, J.,** Concurring.—Although we conclude Grandfather was not coerced to adopt, this is not the first time a complaint of this type has been lodged against Agency. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 407 [2 Cal.Rptr.3d 683, 73 P.3d 541]; *In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1294, 1296 [7 Cal.Rptr.3d 153]; *In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1261 [101 Cal.Rptr.2d 548]; *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1800 [58 Cal.Rptr.2d 684].) It is important to emphasize the Legislature's clearly expressed preference for caretaker adoption.

---

[4] Unlike the commonly used references to section 366.26, subdivision (c)(1)(A) as the "beneficial parent/child relationship exception" or more simply, "(c)(1)(A)," we have not seen an equally accepted shorthand reference to section 366.26, subdivision (c)(1)(D). Here, the term "adoptability" was apparently used to refer to both the finding required under section 366.26, subdivision (c)(1) ("it is likely the child will be adopted") and to the exception to termination of parental rights under section 366.26, subdivision (c)(1)(D):

"The Court: . . . I already ruled on all issues, with the exception of the adoptability of the children, but I now have a [section] 388 [petition] in front of me requesting return to that original hearing and the [section 366.26, subdivision] (c)(1)(A) exception. [¶] . . . [¶]

"[Father's Attorney]: Your Honor, we would be requesting that the finding that none of the [section 366.26, subdivision] (c)(1) [(A)–(E)] exceptions apply be returned to that point in the case, so I have those issues available for trial. As of the last hearing it sounds as if there may be some possibility that the current caregivers are leaning towards guardianship rather than adoption, so—

"The Court: (c)(1)(A) plus his adoptability.

"[Father's Attorney]: And adoptability as well."

*See footnote, *ante*, page 279.

If a caretaker of a child believes Welfare and Institutions Code section 366.26, subdivision (c)(1)(D)[1] should apply to preclude termination of parental rights,[2] the caretaker may seek an alternative permanency plan and *also* remain entitled to the statutory preference for caretaker adoption under section 366.26, subdivision (k). That section provides:

*"Notwithstanding any other provision of law*, the application of any person who, as a relative caretaker or foster parent, has cared for a dependent child for whom the court has approved a permanent plan for adoption, or who has been freed for adoption, shall be given preference with respect to that child over all other applications for adoptive placement if the agency making the placement determines that the child has substantial emotional ties to the relative caretaker or foster parent and removal . . . would be seriously detrimental to the child's emotional well-being.

"As used in this subdivision, 'preference' means that the application shall be processed and, if satisfactory, the family study shall be completed before the processing of the application of any other person for the adoptive placement of the child." (Italics added.)

Legal professionals and social workers working with caretakers considering adoption should inform them they may seek an alternate permanency plan under section 366.26, subdivision (c)(1)(D) without fear of losing their statutory preference as adoptive parents. For the exception to apply, termination of parental rights must be significantly detrimental for the child. The court will not grant an exception under subdivision (c)(1)(D) based only on a preference for guardianship or family antipathy to adoption. (*In re Jose V., supra*, 50 Cal.App.4th at pp. 1800–1801.) If the court finds termination of parental rights would not be detrimental to an adoptable child under section 366.26, subdivision (c)(1)(D) and terminates parental rights, *the caretaker nevertheless remains entitled to preferential consideration for adoptive placement.* (See § 366.26, subd. (k); Fam. Code, § 8730; *In re Sarah S.* (1996) 43 Cal.App.4th 274, 285 [50 Cal.Rptr.2d 503].)

Caretakers should not be advised they will lose their opportunity to provide a permanent home for the children in their care if they are unwilling (or unable) to adopt at the time of the permanency hearing. As the person who meets the child's day-to-day needs, a caretaker's observations concerning any potential detriment to the child caused by terminating parental rights is vitally important to the court. The court, in making the critical decision to terminate

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2] A party to the case may also assert this exception applies.

parental rights or to choose another permanency plan, should be able to hear from a caretaker who does not fear losing the child to another adoptive placement.

Subdivision (n), a new provision in section 366.26 effective January 1, 2006, provides that a court may designate the child's current caretaker as the designated prospective adoptive parent at the section 366.26 hearing or "anytime thereafter." (§ 366.26, subd. (n).) To qualify, the caretaker must have cared for the child at least six months, currently express a commitment to adopt the child and have taken at least one step to facilitate the adoption process, like applying for an adoption home study, being designated by the court or the licensed adoption agency as the adoptive family, or requesting de facto parent status. (§ 366.26, subd. (n)(1), (2).) A designation (or eligibility for that designation) as the prospective adoptive parent gives the current caretaker the right to notice before a change in placement and to petition for a hearing in the event a decision is made to remove the child from the home. (§ 366.26, subd. (n)(3); but see § 366.26, subd. (n)(4) [right to notice not applicable if there is a risk of physical or emotional harm to child].)

Although section 366.26, subdivision (n) provides an incentive for a caretaker to commit to adoption before the permanency hearing, a caretaker who meets threshold eligibility requirements nevertheless retains the right to petition for status as the prospective adoptive parent after the permanency hearing. Section 366.26, subdivision (n) does not alter the view that a child's interests are better served when a caretaker is not pressured to immediately commit to adoption if he or she believes termination of parental rights may be substantially detrimental to the child.

At a permanency hearing in which an alternate permanency plan is sought under section 366.26, subdivision (c)(1)(D), the question, "Are you willing to adopt if parental rights are terminated," puts the cart before the horse. The proper question to ask the caretaker is, "What are your reasons for believing termination of parental rights will be detrimental to the child?" (See § 366.26, subd. (c)(1).) If the court finds termination of parental rights will not be detrimental and adoption is in the child's best interests, Agency's question to the caretaker should be, "Will *you* adopt this child?" (See § 366.26, subd. (k).)

Before a permanency hearing is held, Agency is charged with preparing a "*preliminary assessment* of the eligibility and commitment of any identified prospective adoptive parent *or* legal guardian, particularly the caretaker . . . ." (§ 366.21, subd. (i)(4), italics added.) Agency is not legally entitled before the permanency hearing to promise the caretaker an adoptive placement and threaten to rescind it if the caretaker does not immediately commit to adoption.

The right of the child's current caretaker to postpone a decision on adoption until the court has determined the appropriate permanency plan should be respected.