Filed 6/24/19

## CERTIFIED FOR PARTIAL PUBLICATION[*]

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>J.M.,<br><br>    Defendant and Appellant. | F077508<br><br>(Super. Ct. No. JJD070875)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County. Robert Anthony Fultz and Hugo J. Loza, Judges.[†]

Martin Baker, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Tia M. Coronado and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III and IV of the Discussion.

[†]    Judge Fultz presided on September 5 and 7, 2017; Judge Loza presided on all other hearings pertinent to this appeal.

-ooOoo-

J.M., a minor, was adjudged a ward of the court pursuant to Welfare and Institutions Code section 602, following a finding he made a false report a bomb or other explosive device would be placed in his school, in violation of Penal Code section 148.1, subdivision (c).[1] The offense was designated a felony, and J.M. was placed on probation on various terms and conditions.

In the published portion of this opinion, we hold that J.M.'s words were not protected by the First Amendment to the United States Constitution, and section 148.1, subdivision (c) is not unconstitutionally overbroad. In the unpublished portion, we hold J.M. is not entitled to reversal based on the prosecution's failure to establish the corpus delicti of the offense; but, as he was not properly notified of his right to seek deferred entry of judgment (DEJ), we must conditionally reverse and remand the matter for further proceedings.

## FACTS

J.M. and A.B. attended school together and had known each other for 10 years.[2] On August 30, 2017, they had a conversation after school. Both were supposed to graduate that year, and A.B. asked if J.M. was going to graduate. J.M. said no, because he was behind on credits. He seemed a little upset about it. He was on his phone, but started talking to A.B. about how one day, he was going to "blow up the school, shoot it," and that he knew how to get an Army grenade.[3] A.B. thought he was joking, but she was not sure. He sounded very serious. She told her supervising teacher, "[b]ecause things

---

[1]    Further statutory references are to the Penal Code unless otherwise stated.

[2]    A.B. had never seen J.M. carry a weapon. She did not consider him to be a violent person.

[3]    Shortly after the conversation, A.B. wrote that J.M. said, " 'I will blow up the school one day and I know where to find an army gernade [sic].' [¶] He also talked about skining [sic] someone alive."

2.

like that are really serious." The school was "like . . . [her] home so [she] wanted to protect everybody."

Visalia Police Officer Martinez responded to the school. When Martinez told J.M. the police had been informed he made some comments about blowing up the school, J.M. admitted saying that to A.B., but explained he was "completely joking" and did not intend to cause A.B. panic or concern. Asked how the statements came about, J.M. said he and A.B. were talking about graduation. When he looked at his cell phone, he did not have reception. That was when he made the comment about blowing up the school.

Martinez asked if J.M. had any weapons in his residence; J.M. responded that his grandmother did, and he consented to a search of the home. He also consented to a search of his cell phone for his Internet search history. Martinez looked through weeks of the search history and found nothing of interest to the investigation. Likewise, nothing of interest was found in a search of J.M.'s room at his grandmother's house. The only weapons at the house belonged to his grandmother's late husband. They were under the bed. They were not loaded. The ammunition was in a separate closet.

## DISCUSSION

### I

#### FIRST AMENDMENT

J.M. contends his words were protected by the First Amendment to the United States Constitution, and so were not subject to criminal sanctions. We disagree.[4]

"The First Amendment, applicable to the States through the Fourteenth Amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech.' The hallmark of the protection of free speech is to allow 'free trade in ideas' — even ideas that the overwhelming majority of people might find distasteful or

---

[4] This argument was raised and rejected in the juvenile court, so no question of forfeiture arises. (Cf. *In re Curtis S.* (2013) 215 Cal.App.4th 758, 761-762.)

discomforting.  [Citations.]  Thus, the First Amendment 'ordinarily' denies a State 'the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence.' [Citation.]"  (*Virginia v. Black* (2003) 538 U.S. 343, 358.)

"Content-based regulations are presumptively invalid.  [Citations.]"  (*R.A.V. v. St. Paul* (1992) 505 U.S. 377, 382.)  "The protections afforded by the First Amendment, however, are not absolute, and [the United States Supreme Court has] long recognized that the government may regulate certain categories of expression consistent with the Constitution.  [Citation.]  The First Amendment permits 'restrictions upon the content of speech in a few limited areas, which are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." '  [Citation.]  [¶]  Thus, for example, a State may punish those words 'which by their very utterance inflict injury or tend to incite an immediate breach of the peace.'  [Citations.]  . . . And the First Amendment also permits a State to ban a 'true threat.'  [Citations.]"  (*Virginia v. Black*, *supra*, 538 U.S. at pp. 358-359.)

In cases raising First Amendment issues, an appellate court is required to "make an independent examination of the record . . . to ensure that a speaker's free speech rights have not been infringed by a trier of fact's determination that the communication at issue" is subject to a criminal sanction.  (*In re George T.* (2004) 33 Cal.4th 620, 632; see *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.)

J.M. was found to have violated section 148.1, subdivision (c), which provides: "Any person who maliciously informs any other person that a bomb or other explosive has been or will be placed or secreted in any public or private place, knowing that the information is false, is guilty of a crime . . . ."  Because of the known dangers of bombs and other explosives, "section 148.1 has long prohibited various acts that exploit the public's *fear* of bombs, and that predictably provoke havoc and alarm.  Together, subdivisions (a) and (b) of section 148.1 basically prohibit reports of bombs to law

4.

enforcement officials, emergency personnel, and communication and transportation outlets, where such reports are knowingly false when made. Subdivision (c) of section 148.1 prohibits other malicious acts of disseminating information known to be false about the presence of a bomb." (*People v. Turnage* (2012) 55 Cal.4th 62, 72.)

J.M. says that in order to place an utterance outside of First Amendment protection, "there must be a specific intent to communicate a threat or false information under circumstances where the communication is reasonably likely to cause disruption or sustained fear of harm." He says his words must be evaluated as a false prediction of a future crime and not as a true threat.[5] He concludes: "Because it cannot be said that [J.M.] intended to communicate false information under circumstances where it was reasonably likely that the recipient would be in sustained fear and because the falsely uttered words did not by their nature have the inherent potential to cause alarm or disruption, [J.M.'s] utterance was protected by the First Amendment."

In *In re M.S.* (1995) 10 Cal.4th 698, the California Supreme Court construed section 422.6, a "hate crime" statute that prohibits any person from, by force or threat of force, willfully injuring, intimidating, interfering with, oppressing, or threatening another person because of the victim's actual or perceived gender, race, religion, sexual orientation, or similar characteristic. (*Id.*, subd. (a); see § 422.55, subd. (a).) In upholding the statute against a First Amendment challenge, the court stated: "Under section 422.6, for a conviction based on speech alone, the prosecution must prove the speech itself threatened violence and the defendant had the 'apparent ability' to carry out the threat. . . . [W]hether section 422.6 is violated in a given case should not depend on the robustness or susceptibility of the victim. We therefore construe the phrase 'apparent

---

[5]    " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. [Citations.] The speaker need not actually intend to carry out the threat." (*Virginia v. Black*, *supra*, 538 U.S. at pp. 359-360.)

ability' objectively, as implying the threat must be one that would reasonably tend to induce fear in the victim. [Citation.]" (*M.S.*, *supra*, 10 Cal.4th at pp. 714-715.) The court found the statute required proof of a specific intent to interfere with a person's protected right, and that this requirement helped protect against unconstitutional application to protected speech. (*Id*. at p. 713.) Accordingly, the court declined to read into the statute a requirement of the threat's imminence or immediacy. (*Id*. at pp. 713-714.) It concluded: "As long as the threat reasonably appears to be a serious expression of intention to inflict bodily harm [citation], and its circumstances are such that there is a reasonable tendency to produce in the victim a fear the threat will be carried out [citation], the fact the threat may be contingent on some future event . . . does not cloak it in constitutional protection. [Citations.]" (*Id*. at p. 714.)

In *People v. Lowery* (2011) 52 Cal.4th 419, the state high court considered a First Amendment challenge to section 140, subdivision (a), which criminalizes willfully using or threatening to use force or violence upon the person of a witness to or victim of a crime, because the witness or victim provided assistance or information to a law enforcement officer or prosecutor in a criminal or juvenile court proceeding. The defendant claimed statutes punishing verbal threats violate the First Amendment unless limited to threats made with the specific intent to intimidate the victim, something absent from section 140. (*Lowery*, *supra*, 52 Cal.4th at p. 426.) To ensure constitutionality of section 140, subdivision (a), the court construed it "as applying only to those threatening statements that a reasonable listener would understand, in light of the context and surrounding circumstances, to constitute a true threat, . . . rather than an expression of jest or frustration. The latter category carries First Amendment protection; the former does not. [Citation.]" (*Lowery*, *supra*, at p. 427.) The court concluded that, so construed, the statute did not violate the First Amendment. (*Lowery*, *supra*, at p. 427.)

In our view, the absence of the requirements set out in the foregoing cases does not insulate J.M.'s words from criminal sanctions. Nor does evaluating those words as a

false prediction rather than as a threat. This is made clear by *Levin v. United Air Lines, Inc.* (2008) 158 Cal.App.4th 1002 (*Levin*), which is discussed by both parties, and *People v. Stanistreet* (2002) 29 Cal.4th 497 (*Stanistreet*), which is not mentioned by either.

In *Levin*, the plaintiff arrived at an airline terminal 20 minutes before the scheduled departure of her flight. A series of contentious exchanges ensued between her, airline personnel, and airport security and police, during which the plaintiff made at least three references to a bomb in her luggage. She was arrested for making a false bomb report, then sued various entities and individuals for causes of action that included false arrest. The jury returned a verdict against her, and she appealed. (*Levin*, *supra*, 158 Cal.App.4th at pp. 1006-1007.)

The plaintiff's false arrest claim turned on whether officers lacked probable cause to arrest her for violating section 148.1, subdivision (a).[6] (*Levin*, *supra*, 158 Cal.App.4th at p. 1017.) The appellate court acknowledged the statute does not require a specific intent to cause fear or harm, but rather only that a report was made to a specified person or entity, with knowledge the report was false. (*Id.* at p. 1021.) Nevertheless, the court concluded that "a false statement to airport personnel or peace officers about a bomb in luggage, even if not seriously made or understood," could be the basis for a violation of the statute. (*Id*. at p. 1007.)

In so holding, the appellate court rejected the claim the First Amendment requires the statute to be read to criminalize only " 'true threats.' " (*Levin*, *supra*, 158 Cal.App.4th at p. 1022.) The court explained:

---

**6** Section 148.1, subdivision (a) provides in pertinent part: "Any person who reports to any peace officer . . . , employee of a fire department . . . , district attorney, newspaper, radio station, television station, . . . employees of an airline, employees of an airport, . . . [or] occupants of a building . . . that a bomb or other explosive has been or will be placed or secreted in any public or private place, knowing that the report is false, is guilty of a crime . . . ."

"The concept of a 'true threat' has no application here. Plaintiff was not arrested for making a threat. [Citation.] She was arrested for making a false report of a bomb. . . . [S]ection 148.1, subdivision (a) does not require that the speaker intend to cause fear or harm or that the report cause actual fear or harm. The statute criminalizes falsely uttered words that by their very nature have the inherent potential to cause alarm or disruption if reported to one of the persons or entities identified in the statute. As such, the words prohibited by the statute are similar in nature to the false cry of 'fire' in a crowded theater . . . which has been described as a *verbal act* that is not protected by the First Amendment. [Citations.] Because the making of a false bomb report to the specified persons or entities is not protected speech, the trial court was not required to read any 'true threat' limitation into section 148.1, subdivision (a). [Citation.]

"That the words might be said sarcastically or jokingly, or might even be understood as such, does not provide constitutional protection to the falsely stated words involved here. Because of the nature of the words and the statutorily required recipients, the words should not be deemed protected under the circumstances. Neither the police nor the other persons or entities specified in the statute should be put in the position of having to speculate whether the person making the bomb report intended that it be taken seriously or as a joke.

"The application of section 148.1, subdivision (a) is limited to reports to certain governmental, law enforcement, media, and transportation-related personnel. The statute thereby reflects a legislative determination that false bomb reports to the specified persons or entities are by their nature matters to be taken seriously. Thus, the actual effect on the person to whom the report is made is not an element of the crime. Even if it were, generally the recipients of such a report, because of their positions, would be reasonable in giving credence to that report." (*Levin*, *supra*, 158 Cal.App.4th at pp. 1022-1023, fn. omitted.)

In contrast to subdivision (a) of section 148.1, subdivision (c) of the statute does not require the false report to be made to a person or entity that might loosely be described as having some sort of public function or responsibility. Nevertheless, the falsely uttered words still have the inherent potential to cause fear, alarm or disruption. That the official response might be less extensive or urgent if the false report is made to a private person or if the report is of a future placement of a bomb or explosive, does not

change the fact such an utterance is a verbal act that does not enjoy First Amendment protection.

Nor does constitutional protection result merely because the words might have been said jokingly or in a moment of frustration. Neither A.B. nor any other person should have to guess whether J.M. or some other speaker is serious. Moreover, subdivision (c) of section 148.1, unlike subdivision (a) of the statute, requires that the speaker act "maliciously." Although conviction under a statute proscribing conduct done " 'maliciously' " does not require proof of a specific intent (*People v. Licas* (2007) 41 Cal.4th 362, 366), "[t]he words 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person, or an intent to do a *wrongful* act . . . ." (§ 7, subd. (4), italics added.) This reflects a legislative determination that false reports of bomb placement spoken maliciously to anyone are inherently matters to be taken seriously.

Our conclusion J.M.'s words were not entitled to First Amendment protection is bolstered by *Stanistreet*, *supra*, 29 Cal.4th 497, which considered and rejected a challenge on First Amendment grounds to section 148.6.[7] Drawing extensively from United States Supreme Court opinions concerning defamation, the state high court explained: "[S]peech criticizing the government and governmental officials receives the highest protection. However, this protection does not extend to all speech. 'But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open" debate on public issues. [Citation.] They belong to that category of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." [Citation.]' [Citation.]" (*Stanistreet*, *supra*, at

---

[7] Section 148.6, subdivision (a)(1) provides: "Every person who files any allegation of misconduct against any peace officer, . . . knowing the allegation to be false, is guilty of a misdemeanor."

9.

pp. 504-505.) The court concluded: "Section 148.6 governs false allegations of misconduct only if the person knows them to be false. . . . Thus section 148.6 proscribes only constitutionally unprotected speech." (*Id*. at p. 506.) "In our country, we do not expect, and the Constitution does not require us to tolerate, knowingly false statements of fact." (*Id*. at p. 510.)[8]

## II

### OVERBREADTH

J.M. contends the portion of section 148.1, subdivision (c) he was found to have violated — the false report of a *future* placement of a bomb or other explosive — is unconstitutionally overbroad and facially invalid, because it prohibits a substantial amount of protected speech. We reject his claim.[9]

---

[8] We recognize that in *Stanistreet*, the California Supreme Court observed: "When a person makes a complaint against a peace officer of the type that section 148.6 governs, the agency receiving the complaint is legally *obligated* to investigate it and to retain the complaint and resulting reports or findings for at least five years. [Citation.] Thus, the potential harm of a knowingly false statement is greater here than in other situations." (*Stanistreet*, *supra*, 29 Cal.4th at p. 508.) J.M.'s words did not, of course, legally obligate anyone to investigate. We do not view the absence of such a legal obligation as being of import, as the California Supreme Court's discussion of that point was made in the context of addressing an argument that section 148.6 was unconstitutional because it proscribes knowingly false accusations of misconduct against peace officers only. (*Stanistreet*, *supra*, pp. 501, 508.) J.M. makes no such argument, nor does one seem reasonably possible with respect to section 148.1, subdivision (c).

[9] It does not appear J.M. raised this argument below. The Attorney General appropriately does not claim the issue has been forfeited, however. "All issues, even those involving an alleged constitutional violation, are subject to the rule of forfeiture, and a defendant's failure to raise the issue before the trial court will generally result in the appellate court's refusal to consider it. . . . Notwithstanding this rule of forfeiture, courts generally consider constitutional challenges to penal statutes for the first time on appeal where, as here, the arguments are legal, based on undisputed evidence, and center on review of abstract and generalized legal concepts. [Citations.]" (*People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347-1348, fn. 9; see *In re P.C.* (2006) 137 Cal.App.4th 279, 287.)

"A facial challenge to the constitutional validity of a statute . . . considers only the text of the measure itself, not its application to the particular circumstances of an individual. [Citation.]" (*Tobe v. City of Santa Ana*, *supra*, 9 Cal.4th at p. 1084.) "A statute is facially overbroad if it 'may cause others not before the court to refrain from constitutionally protected speech or expression.' [Citations.] To succeed, 'a constitutional challenge based on asserted overbreadth . . . must demonstrate the statute inhibits a substantial amount of protected speech. [Citation.] "[O]verbreadth . . . must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." [Citation.]' [Citation.]" (*Stanistreet*, *supra*, 29 Cal.4th at p. 511.) "A statute may not be found constitutionally invalid on overbreadth grounds simply because it is possible to conceive of one or a few impermissible applications . . . ." (*People v. Toledo* (2001) 26 Cal.4th 221, 234-235.) Rather, "[t]he overbreadth claimant bears the burden of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists. [Citation.]" (*Virginia v. Hicks* (2003) 539 U.S. 113, 122.)

"In determining a statute's constitutionality, we start from the premise that it is valid, we resolve all doubts in favor of its constitutionality, and we uphold it unless it is in clear and unquestionable conflict with the state or federal Constitutions. [Citation.]" (*Mounts v. Uyeda* (1991) 227 Cal.App.3d 111, 122; see *In re M.S.*, *supra*, 10 Cal.4th at p. 710.) "Invalidation for overbreadth is ' " 'strong medicine' " ' that is not to be 'casually employed.' [Citation.]" (*United States v. Williams* (2008) 553 U.S. 285, 293.)

As we have explained, *ante*, subdivision (c) of section 148.1 criminalizes the malicious communication of *knowingly* false information about placement of a bomb or other explosive. As we have also explained, such utterances are not constitutionally protected.

J.M. fails to demonstrate the statute inhibits a *substantial* amount of protected speech. (Cf. *Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 690 [Fin. Code,

11.

§ 1327[10] held to be unconstitutionally overbroad; statute was not drawn or construed to punish only deliberate false statements of fact].)  In so concluding, we reject his assertion the "future bomb placement" portion of section 148.1, subdivision (c) could only be constitutional if limited to false predictions of bomb placement containing specific dates and locations.  J.M.'s statement here — " 'I will blow up the school one day and I know where to find an army gernade [*sic*]' " — is no less a deliberately false statement of fact than "I am going to blow up the school with a grenade tomorrow at noon."

"Because in virtually all, if not all, of its applications, the crime [proscribed by section 148.1, subdivision (c)] will apply only to speech that is not constitutionally protected, the overbreadth doctrine may not properly be invoked to preclude recognition of that crime."  (*People v. Toledo*, *supra*, 26 Cal.4th at p. 235.)

### III[*]

#### SUFFICIENCY OF THE EVIDENCE OF THE CORPUS DELICTI OF THE CRIME

J.M. contends falsity is an element of a violation of section 148.1, subdivision (c).  He says absent his extrajudicial admission that he was joking, there was insufficient evidence to establish the corpus delicti of the crime.  His claim fails.[11]

---

**10**    "Any person who willfully and knowingly makes, circulates, or transmits to another or others, any statement or rumor, written, printed, or by word of mouth, which is untrue in fact and is directly or by inference derogatory to the financial condition or affects the solvency or financial standing of any bank doing business in this state, or who knowingly counsels, aids, procures, or induces another to start, transmit, or circulate any such statement or rumor, is guilty of a misdemeanor . . . ."  (Fin. Code, § 1327, subd. (a).)

*    See footnote, *ante*, page 1.

**11**    Although J.M. did not raise this claim below, appellate courts will entertain direct claims that a conviction or adjudication cannot stand due to independent evidence of the corpus delicti.  (E.g., *In re I.M.* (2005) 125 Cal.App.4th 1195, 1203.)

12.

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself — i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause.  In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant.  [Citations.]"  (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169.)  "This rule is intended to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened.  [Citations.]"  (*Id.* at p. 1169.)

The requisite proof independent of the defendant's extrajudicial statements "may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible. [Citations.]  There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency.  [Citation.]  In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues. [Citations.]"  (*People v. Alvarez, supra*, 27 Cal.4th at p. 1171.)

The elements of the corpus delicti are not always the same as the elements of the offense, and may or may not include evidence of the defendant's mental state.  (*People v. Hawkins* (2004) 124 Cal.App.4th 675, 680.)  Regardless, "the corpus delicti rule has no application when the defendant's extrajudicial statements constitute the crime."  (*People v. Chan* (2005) 128 Cal.App.4th 408, 420; accord, *In re I.M.*, *supra*, 125 Cal.App.4th at p. 1204; see *People v. Carpenter* (1997) 15 Cal.4th 312, 394, abrogated on another ground by *People v. Diaz* (2015) 60 Cal.4th 1176, 1189-1190 & superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106.)

"According to the plain language of subdivision (c) of section 148.1, a person who maliciously communicates [knowingly] false information about placement of a bomb to

any other person commits a crime." (*People v. Cheaves* (2003) 113 Cal.App.4th 445, 451.) "[T]he purpose of the corpus delicti rule is to prevent the conviction of the innocent by his or her own words of a crime that never happened." (*People v. Chan*, *supra*, 128 Cal.App.4th at p. 420.) Here, the knowingly false communication is itself the crime; J.M.'s admission that he was joking "could not be a confession to a crime that never occurred." (*People v. Carpenter*, *supra*, 15 Cal.4th at p. 394.) The admission of falsity was itself part of the crime. (See *In re I.M.*, *supra*, 125 Cal.App.4th at p. 1204.) It did not have to be independently proved. (See *People v. Carpenter*, *supra*, 15 Cal.4th at p. 394.)[12]

## IV[*]

## **DEJ**

J.M. contends he is entitled to a conditional reversal, and remand for further proceedings, because he was improperly denied his right to seek DEJ. We, like the Attorney General, agree.

DEJ for juveniles is governed by Welfare and Institutions Code section 790 et seq. "The sections provide that in lieu of jurisdictional and dispositional hearings, a minor may admit the allegations contained in a [Welfare and Institutions Code] 602 petition and waive time for the pronouncement of judgment. Entry of judgment is deferred. After the successful completion of a term of probation, on the motion of the prosecution and with a positive recommendation from the probation department, the court is required to dismiss the charges. The arrest upon which judgment was deferred is deemed never to have occurred, and any records of the juvenile court proceeding are sealed. [Citations.]" (*Martha C. v. Superior Court* (2003) 108 Cal.App.4th 556, 558.) "Although . . . the

---

[12]   In any event, the lack of search results of any interest, both of J.M.'s residence and his Internet search history, permit the reasonable inference of falsity. Accordingly, J.M. is not entitled to reversal.

[*]   See footnote, *ante*, page 1.

decision to grant DEJ [to an eligible minor] is a matter of discretion for the juvenile court, . . . the procedures for considering DEJ reflect a 'strong preference for rehabilitation of first-time nonviolent juvenile offenders' and limit the court's power to deny DEJ such that denial of DEJ to an eligible minor who wants to participate is proper only when the trial court finds ' "the minor would not benefit from education, treatment and rehabilitation." ' [Citation.]" (*In re Joshua S.* (2011) 192 Cal.App.4th 670, 675-676, fn. omitted.)

It is undisputed that J.M. was eligible for DEJ. (Welf. & Inst. Code, § 790, subd. (a).) The prosecutor reviewed J.M.'s file, determined J.M. was eligible, and filed form JV-750 ("DETERMINATION OF ELIGIBILITY Deferred Entry of Judgment-Juvenile") with the petition, as required by California Rules of Court, rule 5.800(b)(1).[13] Also issued was form JV-751 ("CITATION AND WRITTEN NOTIFICATION FOR DEFERRED ENTRY OF JUDGMENT-JUVENILE"), by which J.M.'s custodial parent, guardian, or caregiver was ordered to appear at a hearing at which the court was to consider whether to grant DEJ. (Welf. & Inst. Code, § 792; rule 5.800(c).) The citation did not specify a date, time, or department for the hearing, however. Moreover, the record contains only the first page of form JV-751. The second page, which sets out DEJ procedures, consequences, and similar information, as required by Welfare and Institutions Code section 791, is missing.

J.M.'s detention hearing took place on September 5, 2017. At that hearing, J.M.'s attorney denied the allegations of the petition on J.M.'s behalf. No parent, guardian, or caregiver was present. The prosecutor stated for the record that J.M. was DEJ-eligible. The next hearing took place on September 7, 2017. J.M.'s grandmother was present. The prosecutor stated he had handed her "the DEJ form." No DEJ hearing was ever set, nor was further mention made of DEJ during any of the proceedings.

---

[13] All references to rules are to the California Rules of Court.

"[A] juvenile court is not required to rule on a minor's possible suitability for a DEJ where the minor is *properly advised* of his or her DEJ eligibility and fails to admit the charges or waive the jurisdictional hearing because such a failure amounts to a rejection of the DEJ's expedited procedure. [Citations.] [¶] But where, as here, the minor is not properly notified of DEJ procedures, the juvenile court may not fail to consider the minor's suitability." (*In re Trenton D.* (2015) 242 Cal.App.4th 1319, 1325.) " 'The court is not required to ultimately grant DEJ, but is required to at least follow specified procedures and exercise discretion to reach a final determination once the mandatory threshold eligibility determination is made. [Citation.]' [Citation.]" (*In re Joshua S.*, *supra*, 192 Cal.App.4th at p. 678.)

Although J.M. was given notice of his eligibility for DEJ and that a hearing would be held on the matter, he was not given notice of when that hearing would take place or what DEJ entailed. Nor did the court indicate, at any of the hearings, that J.M.'s suitability for DEJ was under consideration. "Accordingly, [J.M.] did not have a full and fair opportunity to request DEJ in lieu of jurisdictional and dispositional hearings. Nor did [J.M.] have the opportunity to present any evidence he might have had . . . ." (*In re D.L.* (2012) 206 Cal.App.4th 1240, 1245.) Reversal is, accordingly, required. (*Ibid*.)

## DISPOSITION

The jurisdictional and dispositional orders are vacated. The case is remanded to the juvenile court for further proceedings in compliance with Welfare and Institutions Code section 790 et seq. and rule 5.800 of the California Rules of Court. If the juvenile court grants deferred entry of judgment (DEJ) to J.M., the jurisdictional and dispositional orders will remain vacated. If the juvenile court denies DEJ to J.M., it shall reinstate the

16.

jurisdictional and dispositional orders, subject to J.M.'s right to have the denial of DEJ reviewed on appeal.

_____

DETJEN, J.

WE CONCUR:


_____

HILL, P.J.


_____

LEVY, J.